NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 25, 2013
Decided September 4, 2013

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN Z. LEE, *District Judge**

| | |
|---|---|
| Nos. 12-2558 & 12-2620 | Appeals from the United States District Court for the Eastern District of Wisconsin. |
| QUAD/GRAPHICS, INC., *Plaintiff-Appellee/Cross Appellant*, *v.* | No. 09-CV-00099 |
| ONE2ONE COMMUNICATIONS, LLC, et al., *Defendants/Third Party Plaintiff-Appellant/Cross-Appellee*, | **J. P. Stadtmueller**, *Judge*. |
| and | |
| BRUCE HEVERLY, *Defendant/Third-Party Plaintiff-Appellant, v.* | |
| OPENFIRST, LLC, et al., *Third-Party Defendants-Appellees.* | |

_____

* John Z. Lee, District Judge for the Northern District of Illinois, sitting by designation.

**O R D E R**

**I**. Background

Since the 1980s, Bruce Heverly worked with or headed companies that processed and provided billing statements for cable television companies. He founded his own company in the 1990s called Comtec, Inc., which offered both billing services and call center services to cable companies. In 2000, Heverly sold his interest in Comtec. Later that year or in early 2001, Robert Kraft, who at the time was president of Openfirst, Inc., a company that specialized in printing billing statements for various companies, asked Heverly about representing Openfirst to cable companies. Openfirst sought out Heverly because the company wished to break into the billing services market for cable companies.

Openfirst and Heverly reached an agreement in 2001, and Heverly began "representing" Openfirst on a commission basis. Whether or not Heverly ever actually became an agent of Openfirst was a hotly contested issue at trial, but the jury found that there was an agency relationship between Heverly and Openfirst. The finding was based on Heverly's course of conduct (explained in more detail below), as there was no written agreement between Heverly and Openfirst.

In 2002, Heverly spoke to Kraft about receiving an official title from Openfirst to assist his sales efforts. In March 2002, Kraft named Heverly CEO of Openfirst's statement processing division, called Openfirst Communications. In May 2002, Heverly incorporated his own company called Openfirst Communications, Inc., headquartered in Madison, Wisconsin, and set himself up as CEO of this corporation as well. Heverly claims this was done with Kraft's knowledge, but Kraft and Openfirst insist they were unaware Heverly had done this, especially since Heverly used the Openfirst name.

Nonetheless, the relationship between Heverly and Openfirst continued, with Heverly bringing in several contracts with various cable companies for Openfirst[1] (or rather, contracts that were assumed to be with Openfirst), until Kraft and his

---

[1] The companies were Seren, Time Warner – Central Florida, Time Warner – Kansas City, Pencor (later known as Bright House) and Insight Communications. Each of the contracts were signed with a single entity, variously called "Openfirst, Inc. DBA Openfirst Communications, Inc.," Openfirst Communications, Inc., DBA Openfirst, Inc.," or "Openfirst Communications, Inc., DBA Openfirst."

management team sold their interests to an investment firm in Chicago in late 2002. During the due diligence portion of the transaction, it was discovered that Heverly had created the separate company with the same name as Openfirst's billing division. Heverly claimed that Kraft had given him permission to form the company, but Kraft denied ever doing so.

Initially Heverly claimed that the contracts he brought in were actually between his own company and the cable companies, and that his company had merely subcontracted the production work to Openfirst. After a meeting between Kraft, Heverly, and others in August 2003, Heverly agreed to change the name of his company. They also agreed that Heverly could continue to work for his own company, which he renamed One2One Communications, LLC. During the negotiations with Heverly, Kraft sought a so-called "evergreen agreement" with Heverly that would provide that the existing contracts between Openfirst and the cable companies would be renewed when they expired, but the agreement was never finalized.

In 2006, Openfirst was sold to Quad/Graphics, Inc. ("Quad"). Quad continued to pay commissions to Heverly and Heverly's company, One2One. Quad was aware that Heverly was conducting his separate business, but also that Heverly was continuing to market the billing statement business for Openfirst under Openfirst's name. In June 2006, Heverly informed Quad that his company One2One had purchased its own printing facility in Bolingbrook, Illinois. Heverly reassured Quad that the acquisition would not affect his "commitment to Openfirst per the term of the business we have placed with you."

In early 2007, an employee of Openfirst named Chuck Olszewski received a phone call from a Time Warner Cable subsidiary. The caller had a technical question about an Openfirst product called "Power View." The call confused Olszewski because Olszewski had been told by Heverly that Openfirst had lost the Time Warner subsidiary as a client. The caller stated that he was working with the Openfirst facility in Illinois and that he could not reach Heverly and so decided to contact Openfirst directly. Olszewski notified Kraft of the call because Openfirst had no facility in Illinois (Heverly's company One2One did, however).

An investigation revealed that Heverly and his company had been soliciting customers away from Openfirst and to their own facility in Illinois. Emails Heverly sent to Openfirst's clients characterized the switch as a change in facilities and gave the

impression that the billing processing work was simply being moved from one Openfirst facility in Milwaukee to a facility in Bolingbrook, Illinois, but the companies were in fact contracting with Heverly's company One2One. Heverly continued to represent himself as CEO of both Openfirst Communications, Inc. (Openfirst's billing statements division) and his own company One2One during these transactions. This left Openfirst's clients believing that they were still contracted with Openfirst when in fact their contracts were now with One2One. And internal emails between Heverly and his One2One employee Rick Brammer showed that Heverly debated disclosing his activities to Kraft, but decided against it after Brammer advised him against it and to "stick to the plan."

Quad decided to terminate its relationship with Heverly entirely. James Nash, a former ComTec employee who had worked with Heverly in the past and was now with Quad, was in charge of executing the strategy to sever the relationship with Heverly. In an email to his colleagues, Nash stated the following: "I am a former lineman and football is usually how I think. I would like to do a nice chop block on [Bruce Heverly] and sew this thing up for us." On March 1, 2007, Quad (which now wholly owned Openfirst) sent a Notice of Termination to Heverly and One2One indicating that Quad was severing all business relations with One2One.

On the same day, Quad employees (including Kraft) attempted to place phone calls to each of Quad's billing customers. During the calls, Kraft told the customers that Heverly had misrepresented his relationship with Openfirst and that Heverly was "merely a sales agent" for Openfirst. Several of the clients with whom Kraft spoke indicated that they did not know that Heverly's company and Openfirst were different entities. One client stated that she believed that her business was being transferred to "Openfirst South" in Illinois. Needless to say, there was no "Openfirst South" in Illinois—the clients' bills were now being processed at One2One's Bolingbrook facility.

Ultimately, One2One and Heverly retained most of the billing statement customers' contracts. Pencor, for example, convened a meeting with in-house counsel and executives to examine the contract it had signed with Heverly. The company determined that the contract with Heverly was valid and binding, and that if Pencor did not honor the contract, Pencor would be in breach. Other clients such as Bright House and Insight did not renew their existing contracts with either Openfirst or Heverly, and subsequently put out Requests for Proposals to solicit bids.

Shortly after learning what Heverly had done, Quad suspended all commission payments to Heverly and One2One. Kraft indicated that it was a collective decision between Quad and its subsidiary Openfirst, and that the decision was motivated by Quad's belief that it had been wronged by Heverly. Openfirst accrued the expense of the commissions on its books with the understanding that if the dispute was resolved in Quad's favor, the commissions would not be paid.

On December 26, 2008, Quad filed suit against One2One and Heverly in Milwaukee County Circuit Court. Quad's claims against both defendants included breach of contract, breach of fiduciary duty, tortious interference with existing and prospective contractual relations, and a state-law fraud claim. Quad also alleged that it had taken an assignment of rights from Openfirst as its parent company to sue on its behalf. Heverly removed the case to the Eastern District of Wisconsin in January 2009 on diversity grounds. After removal, Heverly filed an answer and a counterclaim against Quad in February 2009, as well as a third-party complaint against Kraft and other members of Openfirst's management team

The countersuit included claims for tortious interference with existing and prospective contracts, conspiracy to injure business, and conversion. The third-party suit brought individual claims of defamation against members of Openfirst's management team, including Kraft. A jury trial was set to begin on December 12, 2011. Prior to trial, the parties filed a joint pretrial report which specified the issues to be resolved at trial. Initially One2One and Heverly had disputed that Quad had taken an assignment of rights from Openfirst, but they did not list it as an issue to be tried before the jury in the pretrial report. Additionally, they did not provide jury instructions or verdict form questions on the assignment, and they did approve a joint statement of the case that included language that Quad "has been" assigned Openfirst's rights. Finally, One2One and Heverly did not object to a statement that Quad read to the jury which stated that Quad was standing in place of Openfirst for purposes of the claims in the case.

The case proceeded to a two-week jury trial. At the close of evidence, both parties brought various Rule 50 motions, including a motion by Heverly to dismiss the case in its entirety based on lack of standing because Quad had not put forth any evidence of its alleged assignment of Openfirst's rights. The district court took the motions under advisement and submitted the case to the jury without ruling on the motions.

On December 23, 2011, the jury returned verdicts in both Quad's favor and in Heverly's favor. Specifically, the jury found that One2One and Heverly were agents of Openfirst and breached their fiduciary duties to Openfirst, breached the parties' contract, and tortiously interfered with Openfirst's existing and prospective contracts. The jury also found that Heverly and One2One had acted intentionally and maliciously in doing so. The jury awarded $8 million in compensatory damages to Quad and assessed punitive damages in the amount of $3 million each against Heverly and One2One. The jury rejected most of Heverly's counterclaims, but did find that Quad was liable for conversion for failure to pay Heverly's commissions. It awarded Heverly $410,000 in compensatory damages and assessed punitive damages in the amount of $1 million against Quad.

The parties renewed their post-trial motions, and in January 2012 the district court denied One2One's and Heverly's Rule 50(a) motion seeking to dismiss the case and entered judgment on the verdict. Shortly after judgment was entered, both parties filed additional post-verdict motions, including a motion by Quad seeking to vacate the punitive damages award to Heverly and One2One. In June 2012, the district court issued its order and opinion addressing all of the remaining post-verdict motions brought by the parties. The court remitted Quad's compensatory damages by $272,718, which Quad accepted. The parties then filed cross-appeals.

On appeal, both parties challenge the district court's order denying their various motions. Heverly and One2One seek to vacate the judgments against them and dismiss Quad's claims because, first, Quad lacks standing to bring a claim for damages against Heverly because it never proved a valid assignment of rights from Openfirst. Second, Heverly and One2One contend that all of Quad's damages claims should have been dismissed because the evidence submitted at trial was insufficient to prove the existence of an agency relationship between Openfirst and Heverly. Third, Heverly and One2One contend that the jury's damage award relating to lost profits should be set aside because Heverly and One2One had no evergreen agreement with Openfirst. Finally, Heverly and One2One contend that the punitive damages claims against himself and his company should have been dismissed because there was insufficient evidence of malice toward, and intentional disregard of, Openfirst's rights. Quad, for its part, asserts that the district court erred when it refused to amend the judgment and vacate the awards of compensatory and punitive damages to Heverly and One2One. We consider each argument in turn.

**II**. Discussion

A.      The district court did not err when it ruled that Heverly waived any challenge to Quad's assignment of rights.

While Article III standing is a question of law and is thus reviewed de novo, *see Plotkin v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001), the issue we consider here is not the legal question of whether Quad had standing. Rather, we must determine whether the district court correctly ruled in its Order denying Heverly's motion to dismiss that Heverly had admitted the assignment of rights and therefore waived any challenge to it. Indeed, there is no question that an assignment of rights from Openfirst to Quad would give Quad standing to pursue its claim, *see Spring Commc'ns Co., L.P. v. APCC Servs.*, 554 U.S. 269, 286 (2008). The determination that Heverly admitted to the assignment of rights in a pretrial report is a case management issue, and is reviewed for abuse of discretion. *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1206 (7th Cir. 1989) (holding that a district court has "broad discretion" in case management matters).

This "broad discretion" extends to holding parties to representations made in pretrial orders and other pretrial filings. *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1283 (7th Cir. 1989). Heverly raised Quad's alleged lack of standing as an affirmative defense in his counterclaim, but in the joint final pretrial report the parties submitted, Heverly did not list the validity of the assignment or Quad's standing to sue as an issue to be tried in the case. In fact, the pretrial report (the purpose of which is to narrow and clarify the issues to be tried) states "Quad (which has been assigned Openfirst's rights in this matter) brought suit against One2One and Heverly."

Furthermore, the "Statement of the Issues" section of the pretrial report makes no mention of trying the issue of whether Quad received a valid assignment of rights from Openfirst. Likewise, the jury instructions and verdict form Heverly submitted do not ask the jurors to consider the validity of Quad's assignment. The final jury instructions, which were approved by both parties, identified that Quad/Graphics was "standing in place of Openfirst, LLC." Also, in emails exchanged by the parties' attorneys, Heverly's attorney acknowledged that Quad was standing in place of Openfirst.

These facts support the district court's ruling that Heverly waived any argument that Quad needed to prove a valid assignment of rights from Openfirst. *See Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of Puerto Rico*, Inc., 167 F.3d 1, 12 (1st Cir. 1999)

(holding that where a joint pretrial report contained an undisputed fact contradicting a party's argument raised only on appeal, the appellant had waived the argument by not disputing the fact in the pretrial report). The purpose of a pretrial report is to determine the issues to be tried before the jury, and Heverly explicitly agreed to include language in that report (and in the jury instructions) assuming that Quad stood in place of Openfirst for purposes of the litigation. As the district court correctly noted, it would "fly in the face of the purpose of pretrial proceedings … to hold that Quad failed to prove standing where it clearly operated under the understanding that One2One did not dispute the assignment of claims, would in fact *create* unfair surprise" (emphasis in original). Heverly assented to the presumption that Quad received a valid assignment of rights from its subsidiary Openfirst, and we affirm the district court's order denying Heverly's motion to vacate the judgment.[2]

B.      A reasonable jury could have found that Heverly acted as Quad's agent.

Heverly and One2One next argue that the district court erred by not granting their Rule 50(a) motion with respect to Heverly's acting as an agent on behalf of Openfirst. We review the denial of a Rule 50(a) motion de novo, and review the record "to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict in the light most favorable to the party against whom the motion is directed." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). We do not reweigh the evidence or substitute our own credibility determinations for that of the jury. *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001).

Wisconsin state law governs the agency issue in this diversity action, and Wisconsin has defined an agency relationship as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Troy Co. v. Perry*, 228 N.W.2d 169, 171 (Wis. 1975). To determine if an agency relationship existed between parties, courts look to three elements: "(1) conduct of the principal showing that the agent is to act for him or her; (2) conduct of the agent showing that he or she

---

[2] Even if the district court erred on the assignment issue, the appropriate remedy would be to allow Quad the opportunity to cure any deficiency in its showing by presenting evidence that it received a valid assignment of rights from Openfirst. *See Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 611 (5th Cir. 2004). Given that Openfirst is a wholly-owned subsidiary of Quad, we are satisfied that Quad would have no difficulty curing any alleged deficiency here.

accepts the undertaking; and (3) the parties' understanding that the principal is to control the undertaking." *County of Adams v. McCarthy*, 816 N.W.2d 352 (Wis. Ct. App. 2012) (unpublished) (citing Wisconsin Jury Instruction 4000). The emphasis is on the conduct of the parties: "[a] principal-agent relationship may be created or exist between the parties as a result of their acts and conduct, with or without their knowledge or intent that the relationship was, or is being, created." *Arsand v. City of Franklin*, 264 N.W.2d 579, 581 (Wis. 1978).

At the close of evidence, Heverly and One2One moved to dismiss Quad's claims on the basis, *inter alia*, that Heverly and One2One were not agents of Openfirst as a matter of law. They rest their argument on the fact that neither Heverly nor his company ever actually consented to be agents of Openfirst. Kraft himself admitted that there was no express agreement between them, and Heverly characterizes their relationship as an oral agreement in which Heverly would acquire contracts for his company and Openfirst would provide printing services on behalf of those contracts. Heverly also points to what he views as the lack of evidence that Openfirst actually controlled Heverly's actions in going out to the marketplace and obtaining contracts, and the fact that the contracts were signed by Heverly on behalf of his own company (his "Openfirst Communications," later renamed One2One after the original Openfirst discovered the second company).

The jury rejected these arguments, and we see no reason to disturb their determinations. As the district court ruled, Quad presented sufficient evidence at trial for the jury to find that an agency relationship existed between Openfirst and Heverly. Specifically, the district court noted the following facts that support the jury's finding: Kraft testified that he had asked Heverly to represent Openfirst and provided him with a title (CEO of Openfirst Communications), as well as a company email address, business cards, and an office; Kraft specifically told Heverly that "[a]s long as you represent Openfirst, you can use the name. You can enter into deals for us;" Quad produced an email from 2006 in which Heverly used Openfirst's name to solicit business; customers such as Bright House believed that Openfirst and Heverly were part of the same company; and other testimony and documents showing that Heverly acted on Quad's behalf in soliciting business.

These facts, taken together, are more than sufficient for a jury to find that an agency relationship existed between Openfirst and Heverly. Heverly and One2One spend a great deal of effort trying to recast this evidence, but viewed in the light most

favorable to Quad, a reasonable jury could find the existence of an agency relationship. Thus, the district court did not err when it denied Heverly's and One2One's Rule 50(a) motion to dismiss at the close of evidence.

C.      Evidence supports the jury's verdict for damages from Openfirst's loss of contracts.

Likewise, the district court did not err when it denied Heverly's and One2One's motion to set aside the jury's damage award relating to lost profits. Heverly and One2One argue that there is insufficient evidence to support the jury's finding that they tortiously interfered with Quad's prospective contract rights with its clients Insight and Bright House. They rest their argument on the grounds that there was no evergreen agreement between the parties and that once Bright House and Insight put out Requests for Proposals ("RFPs"), both companies could (and did) compete for those contracts. This shows, in their view, that the prospective contracts at issue between the two companies were not sufficiently certain, concrete, and definite.

Heverly and One2One are correct that a prospective contract must be at least sufficiently certain, concrete, and definite. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 689 (7th Cir. 1999). But in this case, the lack of an evergreen agreement is immaterial. The issue for the jury to consider was not whether the clients would have remained with Openfirst in perpetuity but for Heverly's conduct. Rather, the problem is that Openfirst was unknowingly competing with Heverly for various contracts because Heverly was using his position to solicit contracts away from Openfirst. The jury found that Heverly used Openfirst's name to solicit contracts for his own company and duped the clients into believing that they were contracting with Openfirst when in fact they were contracting with Heverly. The jury found that this conduct breached Heverly's duties to Openfirst and awarded Quad damages for the lost contracts.

Likewise, the fact that Insight and Bright House issued RFPs in the wake of discovering what Heverly was up to does not overcome the legal sufficiency of the prospective contracts with Openfirst. Based on the testimony of employees of Insight and Bright House, both companies would likely have entered into renewal contracts prior to Heverly's conduct coming to light. The evidence submitted by Quad is sufficient for a reasonable jury to find that Insight and Bright House were happy with the existing billing statement arrangement and would have entered into contracts with Openfirst without issuing RFPs but for Heverly's and One2One's conduct. The jury was

instructed (sans objection) that Quad was entitled to recover all damages that were the natural and probable consequences of Heverly's and One2One's actions, and the jury awarded damages accordingly. Therefore, the district court did not err when it denied Heverly's and One2One's motion to set aside damages relating to lost profits.[3]

D.     The evidence supports the jury's award of punitive damages against Heverly and One2One.

Heverly and One2One argue that the district court should not have allowed the jury to consider punitive damages against them for Quad's claims of breach of fiduciary duty and tortious interference with existing and prospective contracts. Their argument rests on the contention that they presented "overwhelming" evidence at trial that showed that Heverly reasonably believed he was not the agent of Openfirst, and therefore he could not as a matter of law have maliciously or intentionally interfered with Openfirst's rights.

In this diversity action, the laws of Wisconsin determine whether a jury may award punitive damages. In Wisconsin, punitive damages may be awarded "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard for the rights of the plaintiff." Wis. Stat. §895.043(3). Wisconsin courts, however, have "not required proof of an intentional desire to injure, vex, or annoy, or proof of malice, in order to sustain an award for punitive damages." *Wangen v. Ford Motor Co.*, 294 N.W.2d 437, 442 (Wis. 1980). In fact, "it is sufficient if the injured party shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer." *Id.*

We have already held that there was sufficient evidence presented at trial for a reasonable jury to find an agency relationship between Heverly and Openfirst. The only question we need consider here is whether there was sufficient evidence presented at trial for the jury to find that Heverly and One2One acted maliciously or with intentional or reckless disregard for Quad's rights. We hold that there was. Despite Heverly's and One2One's multiple attempts to cast the evidence in a different light, there was considerable evidence that Heverly and One2One acted with intentional disregard of Openfirst's rights. As we noted above, Quad submitted evidence that Heverly fraudulently convinced Openfirst's customers that they were contracting with Openfirst

---

[3] The district court did, of course, remit a relatively small amount of the compensatory damages awarded to Quad. Quad accepted the remittitur and does not challenge it on appeal.

when in fact they were contracting with Heverly and One2One; that Heverly called his own plant "Openfirst South" in an attempt to convince customers that they were still clients of Openfirst; that Heverly initially named his own company Openfirst Communications in order to solicit contracts away from Openfirst and to himself; and that Heverly deliberately hid his activities from Openfirst for as long as he could. This evidence is sufficient for a reasonable jury to conclude that Heverly's and One2One's actions merited punishment, and the district court did not err when it denied the Rule 50(a) motion.

E.      The district court did not err when it denied Quad's Rule 59 motion to set aside the jury's award of compensatory and punitive damages on Heverly and One2One's conversion counterclaim.

We next turn to consider whether a reasonable jury could have found that Quad was liable for conversion of Heverly's commissions and award compensatory and punitive damages. In order to alter or amend a judgment under Rule 59(e), the court must find a manifest error of law or fact. *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996). Quad must clearly establish that a manifest error was committed. *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986). Quad contends that, as a matter of law, Heverly and One2One were not entitled to receive payment because the jury found that Heverly and One2One intentionally and maliciously breached its duties to Quad, and also that the award of punitive damages should be vacated because Quad did not act with reckless indifference toward Heverly's and One2One's rights, but withheld compensation for a legitimate reason.

In Wisconsin, "[t]he general rule is that an agent who is dishonest forfeits his or her right to compensation for those duties." *Century Capital Group v. Barthels*, 539 N.W.2d 691, 695 (Wis. Ct. App. 1995). However, the Wisconsin Supreme Court has declined to "adopt the rigid, mechanical rule… that compensation is automatically denied to the agent during the period in which he has committed a wilfull [sic] and significant breach of [the] duty of loyalty." *Hartford Elevator, Inc. v. Lauer*, 289 N.W.2d 280, 287 (Wis. 1980).

Essentially, Quad's argument is that the jury made inconsistent findings. As Quad would have it, the jury could not, as a matter of law, find that Heverly and One2One breached their fiduciary duty to Quad *and also* find Quad liable for conversion of Heverly's commissions. As the district court correctly ruled, this rigid approach has

been rejected in Wisconsin, and we decline to apply it here. While the jury did find that Heverly acted dishonestly, the fact remains that Heverly still delivered contracts to Quad that generated significant profits for Quad, and it was not unreasonable for the jury to find that he was entitled to his commissions for those contracts. Viewing the evidence in the light most favorable to Heverly, Quad cannot clearly establish that the jury's award of compensatory damages was a manifest error of law.

The same holds true for the award of punitive damages. As we noted above, punitive damages may be awarded "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard for of the rights of the plaintiff." Wis. Stat. §895.043(3). Quad asserts that there was nothing deceitful, dishonest, or reckless about their decision to withhold Heverly's commissions after they discovered his fraud. This may be true, but the jury was entitled to draw inferences and make findings of fact on the evidence Heverly and One2One introduced at trial, including emails regarding the withholding of the commissions as well as circumstances surrounding the "blow-up" plan. For example, the email referencing Nash's desire to do a "chop block" on Heverly could support an inference that Quad acted recklessly with regard to Heverly's rights. Also, internal emails between Quad employees could support an inference that Quad retained the commissions to use them as a kind of bargaining chip with Heverly. As one employee wrote, "We are holding onto [Heverly's] commission, and we will see out [sic] the dispute finishes out. Worse case, we pay him. We are accruing the expense … best case, we gain sixteen % to twenty-two % margin pickup." And Heverly and One2One introduced evidence at trial showing that Quad took checks made out to Heverly's company and deposited them into its own accounts.

Ultimately, Quad's argument boils down to a disagreement over the inferences the jury drew from the evidence submitted at trial. But factual determinations and inferences are the province of the jury, and we will not substitute our own credibility determinations for theirs. *See Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001). Because Quad cannot clearly establish that the jury's award of punitive damages was manifest error, the district court did not err when it denied Quad's Rule 59(e) motion to vacate the award.

## **III.** Conclusion

For the foregoing reasons, the district court did not err when it refused to grant either Quad's or Heverly's motions. AFFIRMED.