Justice SOTOMAYOR delivered the opinion of the Court.
Article III, § 1, of the Constitution provides that “[t]he judicial Power of the United States, shall be vested in one supremé Court, and in such inferior Courts as the Congress may from time to time ordain and establish.” Congress has in turn established 94 District Courts and 13 Courts of Appeals, composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished.. Because these protections help to ensure the integrity and independence of the Judiciary, “we have long recognized that, in general, Congress may not withdraw from” the Article III courts “any matter which, from its nature, is the suN ject of a suit at the common law, or in equity, or in admiralty.”- Stern v. Marshall, 564 U.S.-,-, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011) (internal quotation marks omitted).
Congress has also authorized the appointment of bankruptcy and magistrate judges, who do not enjoy the protections of Article III, to assist Article III courts in their work. The number of magistrate and bankruptcy judgeships exceeds the number of circuit and district judgeships.[1] And it is no exaggeration to say that with *1939 out the distinguished service of these judicial colleagues, the work of the federal court system would grind nearly to a halt.[2]
Congress’ efforts to align the responsibilities of non-Artiele III judges with the boundaries set by the Constitution have not always been successful. In Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion), and more recently in Stem, this Court held that Congress violated Article' III by authorizing bankruptcy judges to decide certain claims for which litigants are constitutionally entitled to an Article III adjudication. This case presents the question whether Article III allows bankruptcy judges to adjudicate such claims with the parties’ consent. We hold that Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge.
I
A
Before 1978, district courts typically delegated bankruptcy proceedings to “referees.” Executive Benefits Ins. Agency v. Arkison, 573 U.S. -, -, 134 S.Ct. 2165, 2170, 189 L.Ed.2d 83 (2014). Under the Bankruptcy Act of 1898, bankruptcy referees had “[sjummary jurisdiction” over “claims involving ‘property in the actual or constructive possession of the bankruptcy court’ ”=that is, over the apportionment of the bankruptcy estate among creditors: Ibid, (alteration omitted). They could preside over other proceedings--matters implicating the court’s “plenary jurisdiction”-by consent. Id., at-, 134 S.Ct., at 2170; see also MacDonald v. Plymouth County Trust Co., 286 U.S. 263, 266-267, 52 S.Ct. 505, 76 L.Ed. 1093 (1932).
In 1978, Congress enacted the Bankruptcy Reform Act, which repealed the 1898 Act and gave the newly created bankruptcy courts power “much broader than that exercised under the former referee system.” Northern Pipeline, 458 U.S., at 54, 102 S.Ct. 2858. The Act “[e]liminat[ed] the distinction between ‘summary’ and ‘plenary’ jurisdiction” and enabled bankruptcy courts to decide “all ‘civil proceedings arising under title 11 [the Bankruptcy title] or arising in or related to cases under title 11.’ ” Ibid, (emphasis deleted). Congress thus vested bankruptcy judges with most of the “ ‘powers of a court of equity, law, and admiralty,’ ” id., at 55, 102 S.Ct. 2858 without affording them the benefits of Article III. This Court therefore held parts of the system unconstitutional in Northern Pipeline.
Congress responded by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984. Under that Act, district courts have original jurisdiction over bankruptcy cases and related proceedings. 28 U.S.C. §§ 1334(a), (b). But “[e]ach district court may provide that any or all” bankruptcy cases and related proceedings “shall be referred to the bankruptcy judges for the district.” § 157(a). Bankruptcy judges are “judicial officers of the United States district court,” appointed to 14-year terms by the courts of appeals, and subject to removal for cause. §§ 152(a)(1), (e). “The district court may withdraw” a reference to the bankruptcy court “on its own motion or on timely motion of any party, for cause shown.” § 157(d).
*1940 When a district court refers a case to a bankruptcy judge, that judge’s statutory authority depends on whether Congress has classified the matter as a “[c]ore proceedin[g]” or a “[n]on-core proceeding],” §§' 157(b)(2), (4) — much as the authority of bankruptcy referees, before the 1978 Act, depended on whether the proceeding was “summary” or “plenary.” Congress identified as “[cjore” a nonexclusive list of 16 types of proceedings, § 157(b)(2), in which it thought bankruptcy courts could constitutionally enter judgment.[3] Congress gave bankruptcy courts the power to “hear and determine” core proceedings and to “enter appropriate orders and judgments,” subject to appellate review by the district court. § 157(b)(1); see § 158. But it gave bankruptcy courts more limited authority in non-core proceedings: They may “hear and determine” such proceedings, and “enter appropriate orders and judgments,” only “with the consent of all the parties to the proceeding.” § 157(c)(2). Absent consent, bankruptcy courts in non-core proceedings may only “submit proposed findings of fact and conclusions of law,” which the district courts review de novo. § 157(c)(1).
B
Petitioner Wellness International Network is a manufacturer of health and nutrition products.[4] Wellness and respondent Sharif entered into a contract under which Sharif would distribute Wellness’ products. The relationship quickly soured, and in 2005, Sharif sued Wellness in the United States District Court for the Northern District of Texas. Sharif repeatedly ignored Wellness’ discovery requests and other litigation obligations, resulting in an entry of default judgment for Wellness. The District Court eventually sanctioned Sharif by awarding Wellness over $650,000 in attorney’s fees. This case arises from Wellness’ long-running — and so far’unsuccessful — efforts to collect on that judgment.
In February 2009, Sharif filed for Chapter' 7 bankruptcy in the Northern District of Illinois. The bankruptcy petition listed Wellness as a creditor. Wellness requested documents concerning Sharif’s assets, which Sharif did not provide. Wellness later obtained a loan application Sharif had filed in 2002, listing more than $5 million in assets. When confronted, Sharif informed Wellness and the Chapter 7 trustee that he had lied on the loan application. The listed assets, Sharif claimed, were actually owned by the Soad Wattar Living Trust (Trust), an entity Sharif said he administered on behalf of his mother, and for the benefit of his sister. Wellness pressed Sharif for information on the Trust, but Sharif again failed to respond.
Wellness filed a five-count adversary complaint against Sharif in the Bankruptcy Court. See App. 5-22. Counts I-IY of the complaint objected to the discharge of Sharif s debts because, among other reasons, Sharif had concealed property by claiming that it was owned by the Trust. Count V of the complaint sought a declaratory'judgment that the Trust was Sharif s alter ego. and that its assets should therefore be treated as part of Sharif s bankruptcy estate. Id., at 21. In his answer, *1941 Sharif admitted that the adversary proceeding was a “core proceeding” under 28 U.S.C. § 157(b)-i.e., a proceeding in which the Bankruptcy Court could enter final judgment subject to appeal. See §§ 157(b)(1), (2)(J); App. 24. Indeed, Sharif requested judgment in his favor on all counts of Wellness’ complaint and urged the Bankruptcy Court to “find that the Soad Wattar Living Trust is not property of the [bankruptcy] estate.” Id., at 44.
A familiar pattern of discovery evasion ensued. Wellness responded by filing a motion for sanctions, or, in the alternative, to compel discovery. Granting the motion to compel, the Bankruptcy Court warned Sharif that if he did not respond to Wellness’ discovery requests a default judgment would be entered against him. Sharif eventually complied with some discovery obligations, but did not produce any documents related to the Trust.
In July 2010, the Bankruptcy Court issued a ruling finding that Sharif had violated the court’s discovery order. See App. to Pet. for Cert. 92a-120a. It accordingly denied Sharifs request to discharge his debts and entered a default judgment against him in the adversary proceeding. And it declared, as requested by count V of Wellness’ complaint, that the assets supposedly held by the Trust were in fact property of Sharifs bankruptcy estate because Sharif “treats [the Trust’s] assets as his own property.” Id., at 119a.
Sharif appealed to the District Court. Six weeks before Sharif filed his opening brief in the District Court, this Court decided Stem. In Stem, the Court held that Article III prevents bankruptcy courts from entering final judgment on claims that seek only to “augment” the bankruptcy estate and would otherwise “exis[t] without regard to any bankruptcy proceeding.” 564 U.S., at-,-, 131 S.Ct., at 2614, 2618. Sharif did not cite Stem in his opening brief. Rather, after the close of briefing, Sharif moved for leave to file a supplemental brief, arguing that in light of In re Ortiz, 665 F.3d 906 (C.A.7 2011)-a recently issued decision interpreting Stemr&emdash;“ the bankruptcy court’s order should only be treated as a report and recommendation.” App. 145. The District Court denied Sharifs motion for supplemental briefing as untimely and affirmed the Bankruptcy Court’s judgment.
The Court of Appeals for the Seventh Circuit affirmed in part -and reversed in part. 727 F.3d 751 (2013). The Seventh Circuit acknowledged that ordinarily Sharifs Stem objection would “not [be] preserved because he waited too long to assert it.” 727 F.3d, at 767.[5] But the court determined that the ordinary rule did not apply because Sharifs argument concerned “the allocation of authority between bankruptcy courts and district courts” under Article III, and thus “implicate[d] structural interests.” Id., at 771. Based on those separation-of-powers considerations, the court held that “a litigant may not waive” a Stem objection. Id., at 773. Turning to the merits of Sharifs contentions, the Seventh Circuit agreed with the Bankruptcy Court’s resolution of counts I-IV of Wellness’ adversary complaint. It further concluded, however, that count V of the complaint alleged a so-called “Stem claim,” that is, “a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as *1942 a constitutional matter.” Executive Benefits, 573 U.S., at-, 134 S.Ct., at 2170. The Seventh Circuit therefore ruled that the Bankruptcy Court lacked constitutional authority to enter final judgment on count V.[6]
We granted certiorari, 573 U.S. -, 134 S.Ct. 2901, 189 L.Ed.2d 854 (2014), and now reverse the judgment of the Seventh Circuit.[7]
II
Our precedents make clear that litigants may validly consent to adjudication by bankruptcy courts.
A
Adjudication by consent is nothing new. Indeed, “[djuring the early years of the Republic, federal courts, with the consent of the litigants, regularly referred adjudication of entire disputes to non-Article III referees, masters, or arbitrators, for entry of final judgment in accordance with the referee’s report.” Brubaker, The Constitutionality of Litigant Consent to Non-Article III Bankruptcy Adjudications, 32 Bkrtcy. L. Letter No. 12, p. 6 (Dec. 2012); see, e.g., Thornton v. Carson, 7 Cranch 596, 597, 3 L.Ed. 451 (1813) (affirming damages awards in two actions that “were referred, by consent under a rule of Court to arbitrators”); Heckers v. Fowler, 2 Wall. 123, 131, 17 L.Ed. 759 (1865) (observing that the “[p]ractice of referring pending actions under a rule of court, by consent of parties, was well known at common law,” and “is now universally regarded ... as the proper foundation of judgment”); Newcomb v. Wood, 97 U.S. 581, 583, 24 L.Ed. 1085 (1878) (recognizing “[t]he power of a court of justice, with the consent of the parties, to appoint arbitrators and refer a case pending before it”).'
The foundational case in the modern era is Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). The Commodity Futures Trading Commission (CFTC), which Congress had authorized to hear customer complaints against commodities brokers, issued a regulation allowing itself to hear state-law counterclaims as well. William Schor filed a complaint with the CFTC against his broker, and the broker, which had previously filed claims against Schor in federal court, refiled them as counterclaims in the CFTC proceeding. The CFTC ruled against Schor on the counterclaims. This Court upheld that ruling against both statutory and constitutional challenges.
On the constitutional question (the one relevant here) the Court began by holding' that Schor had “waived any right he may have possessed to the full trial of [the broker’s] counterclaim before an Article III court.” Id., at 849, 106 S.Ct. 3245. *1943 The Court then explained why this waiver legitimated the CFTC’s exercise of authority: “[A]s a personal right, Article Ill’s guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights”&emdash;such as the right to a jury&emdash;“that dictate the procedures by which civil and criminal matters must be tried.” Id., at 848-849, 106 S.Ct. 3245.
The Court went on to state that a litigant’s waiver of his “personal right” to an Article III court is not always dispositive because Article III “not only preserves to litigants their interest in an. impartial and independent federal adjudication of claims ..., but also serves as ‘an inseparable element of the constitutional system of checks and balances.’ ... To the extent that this structural principle is implicated in a given case”&emdash;but only to that extent&emdash; “the parties cannot by consent cure the constitutional difficulty....” Id., at 850-851,106 S.Ct. 3245.
Leaning heavily on the importance of Schor’s consent, the Court found no structural concern implicated by the CFTC’s adjudication of the counterclaims against him. While “Congress gave the CFTC the authority to adjudicate such matters,” the Court wrote,
“the decision to invoke this forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction of these matters is unaffected. In such circumstances, separation of powers concerns are diminished, for it seems self-evident that just as Congress may encourage parties to settle a dispute out of court or resort to arbitration without impermissible incursions on the separation of powers, Congress may make available a quasi-judicial mechanism through which willing parties may, at their option, elect to resolve their differences.” Id., at 855, 106 S.Ct. 3245.
The option for parties to submit their disputes to a non-Article III adjudicator was at most a “de minimis ” infringement on the prerogative of the federal courts. Id., at 856, 106 S.Ct. 3245.
A few years after Schor, the Court decided a pair of cases—Gomez v. United States, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), and Peretz v. United States, 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991)—that reiterated the importance of consent to the constitutional analysis. Both cases concerned whether the Federal Magistrates Act authorized magistrate judges to preside over jury selection in a felony trial;[8] the difference was that Peretz consented to the practice while Gomez did not. That difference was dispositive.
In Gomez, the Court interpreted the statute as not allowing magistrate judges to supervise voir dire without consent, emphasizing the constitutional concerns that might otherwise arise. See 490 U.S., at 864, 109 S.Ct. 2237. In Peretz, the Court upheld the Magistrate Judge’s action, stating that “the defendant’s consent significantly changes the constitutional analysis.” 501 U.S., at 932, 111 S.Ct. 2661. The Court concluded that allowing a magistrate judge to supervise jury selection&emdash; with consent&emdash;does not violate Article III, explaining that “litigants may waive their personal right to have an Article III judge preside over a civil trial,” id., at 936, 111 S.Ct. 2661 (citing Schor, 478 U.S., at 848, 106 S.Ct. 3245), and that “[t]he most basic rights of criminal defendants are similarly subject to waiver,” 501 U.S., at 936, 111 *1944 S.Ct. 2661. And “[e]ven assuming that a litigant may not waive structural protections provided by Article III,” the Court found “no such structural protections .... implicated by” a magistrate judge’s supervision of voir dire:
“Magistrates are appointed and subject to removal by Article III judges. The ‘ultimate decision’ whether to invoke the magistrate’s assistance is made by the district court, subject to veto, by the parties. The decision whether to empanel the jury whose selection a magistrate has supervised also remains entirely with the district court. Because ‘the entire process takes place under the district court’s total control and jurisdiction,’ there is no danger that use of the magistrate involves a ‘congressional attempt “to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating” constitutional courts.’ ” Id., at 937, 111 S.Ct. 2661 (citations omitted; alteration in original).[9]
The lesson of Schor, Peretz; and the history that preceded them is plain: The entitlement to an Article III adjudicator is “a personal right” and thus ordinarily “subject to waiver,” Schor, 478 U.S., at 848, 106 S.Ct. 3245. Article III also serves a structural purpose, “barring congressional attempts ‘to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating’ constitutional courts and thereby preventing] ‘the encroachment or aggrandizement of one branch at the expense of the other.’ ” Id., at 850, 106 S.Ct. 3245 (citations omitted). But allowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers so long as Article III courts retain supervisory authority over the process.
B
The question here, then, is whether allowing bankruptcy courts to decide Stem claims by consent would “impermissibly threate[n] the institutional integrity of the Judicial Branch.” Schor, 478 U.S., at 851, 106 S.Ct. 3245. And that question must be decided not by “formalistic and unbending rules,” but “with an eye to the practical effect that the” practice “will have on the constitutionally assigned role of the federal judiciary.” Ibid.; see Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 587, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (“[Practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III”). The Court must weigh
“the extent to which the essential attributes of judicial power are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.” Schor, 478 U.S., at 851, 106 S.Ct. 3245 (internal quotation marks omitted).
Applying these factors, we conclude that allowing bankruptcy litigants to waive the right to Article III adjudication of Stem claims does not usurp the *1945 constitutional prerogatives of Article’ III courts. Bankruptcy judges, like magistrate judges, “are appointed and subject to removal by Article III judges,” Peretz, 501 U.S., at 937, 111 S.Ct. 2661; see 28 U.S.C. §§ 152(a)(1), (e). They “serve as judicial officers of the United States district court,” § 151, and collectively “constitute a unit of the district court” for that district, § 152(a)(1). Just as “[t]he ‘ultimate decision’ whether to invoke [a.] magistrate [judge]’s assistance is made by the district court,” Peretz, 501 U.S., at 937, 111 S.Ct. 2661 bankruptcy courts hear matters solely on a district court’s reference, § 157(a), which the district court may withdraw sua sponte or at the request of a party, § 157(d). “[Separation of powers concerns are diminished” when, as here, “the decision to invoke [a non-Article III] forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction” remains in place. Schor, 478 U.S., at 855, 106 S.Ct. 3245.
Furthermore, like the CFTC in Schor, bankruptcy courts possess no free-floating authority to decide claims traditionally heard by Article III courts. Then-ability to resolve such matters is limited to “a narrow class of common law claims as an incident to the [bankruptcy courts’] primary, and unchallenged, adjudicative function.” Id., at 854, 106 S.Ct. 3245. “In such circumstances, the magnitude of any intrusion on the Judicial Branch can only be termed de minimis.” Id., at 856, 106 S.Ct. 3245.
Finally, there is no indication that Congress gave bankruptcy courts the ability to decide Stem claims in an effort to aggrandize itself of humble the Judiciary. As in Peretz, “[b]ecause ‘the entire process takes place under the district court’s total control and jurisdiction,’ there is no danger that use of the [bankruptcy court] involves a ‘congressional attemp[t] “to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating” constitutional courts.’ ” 501 U.S., at 937, 111 S.Ct. 2661 (citation omitted); see also Schor, 478 U.S., at 855, 106 S.Ct. 3245 (allowing CFTC’s adjudication of counterclaims because of “the degree of judicial control saved to the federal courts, as well as the congressional purpose behind the jurisdictional delegation, the demonstrated need for the delegation, and the limited nature of the delegation” (citation omitted)); Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537, 544 (C.A.9 1984) (en banc) (Kennedy, J.) (magistrate judges may adjudicate civil cases by consent because the Federal Magistrates Act “invests the Article III judiciary with extensive administrative control over the management, composition, and operation of the magistrate system”).[10]
*1946 Congress could choose to rest the full share of the Judiciary’s labor on the shoulders of Article III judges. But doing so would require a substantial increase in the number of district judgeships. Instead, Congress has supplemented the capacity of district courts through the able assistance of bankruptcy judges. So long as those judges are subject to control by the Article III courts, their work poses no threat to , the separation of powers.
C
Our recent decision in Stem, on which Sharif and the principal dissent rely heavily, does not compel a different result. That is because Stem — like its predecessor, Northern Pipeline — turned on the fact that the litigant “did not truly consent to” resolution of the claim against it in a npn-Article. Ill forum. 564 U.S., at -, 131 S.Ct., at 2614.
To understand Stem, it is necessary to first understand Northern Pipeline. There, the Court considered whether bankruptcy judges “could ‘constitutionally be vested with jurisdiction to decide [a] state-law contract claim’ against an entity that was not otherwise part of the bank- . ruptey proceedings.” 564 U.S., at -, 131 S.Ct., at 2609-2610. In answering that question in the negative, both the plurality and then-Justice Rehnquist, concurring in the judgment, noted that the entity in question did not consent to the bankruptcy court’s adjudication of the claim. See 458 U.S., at 80, n. 31, 102 S.Ct. 2858 (plurality opinion); id., at 91, 102 S.Ct. 2858 (opinion of Rehnquist, J.). The Court confirmed in two later cases that Northern Pipeline turned on the lack of consent. See Schor, 478 U.S., at 849, 106 S.Ct. 3245 (“[I]n Northern Pipeline, ... the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication”);. Thomas, 473 U.S., at 584, 105 S.Ct. 3325.
Stem presented the same scenario. The majority cited the dissent’s observation that Northern Pipeline “established] only that Congress may not yest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review,” 564 U.S., at -, 131 S.Ct., at 2615 (emphasis added; internal quotation marks omitted). To which the majority responded, “Just so: Substitute ‘tort’ for ‘contract,’ and that statement directly covers this case.” Id., at -, 131 S.Ct., at 2615; see also id., at -, 131 S.Ct., at 2614 (defendant litigated in the Bankruptcy Court because he “had nowhere else to go” to pursue his claim). Because Stem was premised on noncon-sent to adjudication by the Bankruptcy Court, the “constitutional bar” it announced, see post, at 1957 (ROBERTS, C.J., dissenting), simply does not govern the question whether litigants may validly consent to adjudication by a bankruptcy court. .
An expansive reading of Stem, moreover, would be inconsistent with the opinion’s own description of its holding. The Court in Stem took pains to note that the question before it was “a ‘narrow’ one,” and that its answer did “not change all *1947 that much” about the division of labor between district courts and bankruptcy courts. Id., at -, 131 S.Ct., at 2620; see also id., at -, 131 S.Ct., at 2620 (stating that Congress had exceeded the limitations of Article III “in one isolated respect”). That could not have been a fair characterization of the decision if it meant that bankruptcy judges could no longer exercise their longstanding authority to resolve claims submitted to them by consent. Interpreting Stem to bar consensual adjudications by bankruptcy courts would “meaningfully chang[e] the division of labor” in our judicial system, contra, id., at -, 131 S.Ct., at 2620.[11]
In sum, the cases in which this Court has found a violation of a litigant’s right to an Article III decisionmaker have involved an objecting defendant forced to litigate involuntarily before a non-Article III court. The Court has never done what Sharif and the principal dissent would have us do&emdash;hold that a litigant who has the right to an Article III court may not waive that right through his consent.
D
The principal dissent warns darkly of the consequences of today’s decision. See post, at 1958 -1960. To hear the principal dissent tell it, the world will end not in fire, or ice, but in a bankruptcy court. The response to these ominous predictions is the same now as it was when Justice Brennan, dissenting in Schor, first made them nearly 30 years ago:
“This is not to say, of course, that if Congress created a phalanx of non-Arti-ele III tribunals equipped to handle the entire business of the Article III courts without any Article III supervision or control and without evidence of valid and specific legislative necessities, the fact that the parties had the election to proceed in their forum of choice would necessarily save the scheme from constitutional attack. But this ease obviously .bears no resemblance to such a scenario....” 478 U.S., at 855, 106 S.Ct. 3245 (citations omitted).
Adjudication based on litigant consent has been a consistent feature of the federal court system since its inception. Reaffirming that unremarkable fact, we are confident, poses no great threat to anyone’s birthrights, constitutional or otherwise.
Ill
Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be express. We disagree.
Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent; it states only that a bankruptcy court must obtain “the consent”&emdash;consent simpliciter&emdash;“of all parties to the proceeding” before hearing and determining a non-core claim. § 157(c)(2). And a requirement of express consent would be in great tension with our decision in Roell v. Withrow, 538 U.S. 580, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003). That *1948 case concerned the interpretation of § 636(c), which authorizes magistrate judges to “conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case,” with “the consent of the parties.”[12] The specific question in Roell was whether, as a statutory matter, the “consent” required by § 636(c) had to be express. The dissent argued that “[rjeading § 636(c)(1) to require express consent not only is more consistent with the text of the statute, but also” avoids constitutional concerns by “ensur[ing] that the parties knowingly and voluntarily waive their right to an Article III judge.” 538 U.S., at 595, 123 S.Ct. 1696 (opinion of THOMAS, J.). But the majority—thus placed on notice of the constitutional concern—was untroubled by it, opining that “the Article III right is substantially honored” by permitting waiver based on “actions rather than words.” Id., at 589, 590, 123 S.Ct. 1696.
The implied consent standard articulated in Roell supplies the appropriate rule for adjudications by bankruptcy courts under § 157. Applied in the bankruptcy context, that standard possesses the same pragmatic virtues—increasing judicial efficiency and checking gamesmanship—that motivated our adoption of it for consent-based adjudications by magistrate judges. See id., at 590, 123 S.Ct. 1696. It bears emphasizing, however, that a litigant’s consent—whether express or implied—must still be knowing and voluntary. Roell makes clear that the key inquiry is whether “the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case” before the non-Article III adjudicator. Ibid.; see also id., at 588, n. 5, 123 S.Ct. 1696 (“notification of the right to refuse” adjudication by a non-Article III court “is a prerequisite to any inference of consent”).[13]
IV
It would be possible to resolve this case by determining whether Sharif in fact consented to the Bankruptcy Court’s adjudica *1949 tion of count V of Wellness’ adversary, complaint. But reaching that determination would require a deeply factbound analysis of the procedural history unique to this protracted litigation. Our resolution of the consent question — unlike the antecedent constitutional question — would provide little guidánce to litigants or the lower courts. Thus, consistent with our role as “a court of review, not of first view,” Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. -, -, 134 S.Ct. 2120, 2131, 189 L.Ed.2d 37 (2014) (internal quotation marks omitted), we leave it to the Seventh Circuit to decide on remand whether Sharif s actions evinced the requisite knowing and voluntary consent, and also whether, as Wellness contends, Sharif forfeited his Stem argument below.
* ■ * *
The Court holds that Article III permits bankruptcy courts to decide Stem claims submitted to them by consent. The judgment of the United States Court of Appeals for the Seventh Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

. Congress has authorized 179 circuit judge-ships and 677 district judgeships, a total of 856. United States Court's, Status of Article III Judgeships, http://www.uscourts.gov/ Statistics/JudicialBusiness/2014/status-article-iii-judgeships.aspx (all Internet materials as visited May 22, 2015, and available in Clerk of Court's case file). The number of authorized magistrate and bankruptcy judgeships currently stands at 883: 534 full-time magistrate judgeships and 349 bankruptcy judge-ships. United States Courts, Appointments of Magistrate Judges, http://www.uscourts.gov/ Statistics/JudicialBusiness/2014/ appointments-magistrate-judges.aspx; United States Courts, Status of Bankruptcy Judge-ships, http://www.uscourts.gov/Statistics/ JudicialBusiness/2014/status-bankruptcy-judgeships.aspx.

. Between October 1, 2013, and September 30, 2014, for example, litigants filed 963,739 cases in bankruptcy courts&emdash;more than double the total number filed in district and circuit courts. United States Courts, Judicial Caseload Indicators, http://www.uscourts.gov/ Statistics/JudicialBusiness/2014/judicial-caseload-indicators.aspx.

. Congress appears to have drawn the term "core” from Northern Pipeline’s description of "the restructuring of debtor-creditor relations” as "the core of the federal bankruptcy power.” Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S., 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

. Individual petitioners Ralph and Cathy Oats are Wellness’ founders. This opinion refers to all petitioners collectively as "Wellness.”

. Although the Seventh Circuit referred to Sharifs failure to raise his Stem argument in a timely manner as a waiver, that court has since clarified that its decision rested on forfeiture. See Peterson v. Somers Dublin Ltd., 729 F.3d 741, 747 (2013) ("The issue in Wellness International Network was forfeiture rather than waiver”).

. The Seventh Circuit concluded its opinion by considéring the remedy for the Bankruptcy Court’s purportedly unconstitutional issuance of a final judgment. The court determined • that if count V of Wellness’ complaint raised a core claim, the only statutorily authorized remedy would be for the District Court to withdraw the reference to the Bankruptcy Court and set a new discovery schedule. The Seventh Circuit’s reasoning on this point was rejected by our decision last Term in Executive Benefits, which held that district courts may treat Stem claims like non-core claims and thus are not required to restart proceedings entirely when a bankruptcy court improperly enters final judgment.

. Because the Court concludes that the Bankruptcy Court could validly enter judgment on Wellness’ claim with the parties’ consent, this opinion does not address, and expresses no view on, Wellness’ alternative contention that the Seventh Circuit erred in concluding the claim in count V of its complaint was a Stem claim.

. In relevant part, the Act provides that district courts may assign magistrate judges certain enumerated duties as well as "such additional duties as are not inconsistent with the Constitution and the laws of the United States.” 28 U.S.C. § 636(b)(3).

. Discounting the relevance of Gomez and Peretz, the principal dissent emphasizes that neither case concerned the entry of final judgment by a non-Article III actor. See post, at - (opinion of ROBERTS, C.J.). Here again, the principal dissent's insistence on formalism leads it astray. As we explained in Peretz, the "responsibility and importance [of] presiding over voir dire at a felony trial” is equivalent to the “supervision of entire civil and misdemeanor trials,” 501 U.S., at 933, 111 S.Ct. 2661 tasks in which magistrate judges may "order the entry of judgment” with the parties’ consent, § 636(c)(1).

. The principal dissent accuses us of making Sharif's consent " 'dispositive' in curing [a] structural separation of powers violation,” contrary to the holding of Schor. Post, at -. That argument misapprehends both Schor and the nature of our analysis. What Schor forbids is using consent to excuse an actual violation of Article III. See 478 U.S., at 850-851, 106 S.Ct. 3245 (“To the extent that th[e] structural principle [protected by Article III] is implicated in a given case, the parties cannot by consent cure the constitutional difficulty ...” (emphasis added)). But Schor confirms that consent remains highly relevant when determining, as we do here, whether a particular adjudication in fact'raises constitutional concerns. See id., at 855, 106 S.Ct. 3245 ("separation of powers concerns are diminished” when "the decision to invoke [a non-Article. Ill] forum is left entirely to the parties”). Thus, we do not rely on Sharif's consent to “cur[e]” a violation of Article III. His consent shows, in part, why no such violation has occurred. Cf. Meltzer, Legislative Courts, Legislative Power, and the Constitution, 65 Ind. L. J. 291, 303 (1990) ("[C]onsent provides, if not complete, at least very considerable reason to doubt that the *1946 tribunal poses a serious threat to the ideal of federal adjudicatory independence”); Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915, 992 (1988) (when the parties consent, "there is substantial assurance that the agency is not generally behaving arbitrarily or otherwise offending separation-of-powers values. Judicial integrity is not at risk”).

. In advancing its restrictive view of Stem, the principal dissent ignores the sweeping jurisprudential implications of its position. If, as the principal dissent suggests, consent is irrelevant to the Article III analysis, it is difficult to see how Schor and Peretz were not wrongly decided. But those decisions obviously remain good law. It is the principal dissent's position that breaks with our precedents. See Plant v. Spendthrift Farm, Inc., 514 U.S. 211, 231, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("[T]he proposition that legal defenses based upon doctrines central to the courts’ structural independence can never be waived simply does not accord with our cases”).

. Consistent with our precedents, the Courts of Appeals have unanimously upheld the constitutionality of § 636(c). See Sinclair v. Wainwright, 814 F.2d 1516, 1519 (C.A.11 1987); Bell & Beckwith v. United States, 766 F.2d 910, 912 (C.A.6 1985); Gairola v. Virginia Dept. of Gen. Servs., 753 F.2d 1281, 1285 (C.A.4 1985); D.L. Auld Co. v. Chroma Graphics Corp., 753 F.2d 1029, 1032 (C.A.Fed. 1985); United States v. Dobey, 751 F.2d 1140, 1143 (C.A.10 1985); Fields v. Washington Metropolitan Area Transit Auth., 743 F.2d 890, 893 (C.A.D.C.1984); Geras v. Lafayette Display Fixtures, Inc., 742 F.2d 1037, 1045 (C.A.7 1984); Lehman Bros. Kuhn Loeb Inc. v. Clark Oil & Refining Corp., 739 F.2d 1313, 1316 (C.A.8 1984) (en banc); Puryear v. Ede’s Ltd., 731 F.2d 1153, 1154 (C.A.5 1984); Gold-stein v. Kelleher, 728 F.2d 32, 36 (C.A.1 1984); Collins v. Foreman, 729 F.2d 108, 115-116 (C.A.2 1984); Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc., 725 F.2d 537, 540 (C.A.9 1984) (en banc) (Kennedy, J.); Wharton-Thomas v. United States, 721 F.2d 922, 929-930 (C.A.3 1983).

. Even though the Constitution does not require that consent be express, it is good practice for courts to seek express statements of consent or nonconsent, both to ensure irrefutably that any waiver of the right to Article III adjudication is knowing and voluntary and to limit subsequent litigation over the consent issue. Statutes or judicial rules may require express consent where the Constitution does not. Indeed, the Federal Rules of Bankruptcy Procedure already require that pleadings in adversary proceedings before a bankruptcy court "contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge.” Fed. Rule Bkrtcy. Proc. 7008 (opening pleadings); see Fed. Rule Bkrtcy. Proc. 7012 (responsive pleadings). The Bankruptcy Court and the parties followed that procedure in this case. See App. 6, 24; supra, at 1940-1941.