**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3410
_____

In re: ONE2ONE COMMUNICATIONS, LLC,
Debtor

QUAD/GRAPHICS, INC.,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 2-13-cv-01675)
District Judge: Honorable Jose L. Linares

Argued:  October 29, 2014
_____

Before:  MCKEE, *Chief Judge*, GREENAWAY, JR., and
KRAUSE, *Circuit Judges*.

(Filed: July 21, 2015)

Courtney A. Schael, Esq. (Argued)
Ashford Schael
1371 Morris Avenue
Union, NJ 07083

Timothy F. Nixon, Esq.
Godfrey & Kahn
333 Main Street
Suite 600, P.O. Box 13067
Green Bay, WI 54307

*Attorneys for Appellant*

Michael D. Sirota, Esq. (Argued)
David M. Bass, Esq.
Cole Schotz
25 Main Street
Court Plaza North, P.O. Box 800
Hackensack, NJ 07601

Joseph DiPasquale, Esq.
Henry M. Karwowski, Esq.
Richard D. Trenk, Esq.
Trenk, DiPasquale, Della Fera & Sodono
347 Mount Pleasant Avenue
Suite 300
West Orange, NJ 07052

*Attorneys for Debtor*

Kenneth A. Rosen, Esq.
Lowenstein Sandler
65 Livingston Avenue

Roseland, NJ 07068

*Attorney for the Official Committee of Unsecured Creditors, Defendant*

Martha R. Hildebrandt, Esq.
Office of United States Trustee
One Newark Center
Suite 2100
Newark, NJ 07102

*Attorney for the Office of United States Trustee*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

Appellant Quad/Graphics Inc. appeals from the judgment of the District Court affirming the Bankruptcy Court's confirmation of One2One Communications, LLC's (the "Debtor") Chapter 11 plan of reorganization and dismissing Appellant's bankruptcy appeal as equitably moot. Appellant contends that the District Court abused its discretion in dismissing its appeal as equitably moot. Appellant also asks us to use this appeal to overrule our adoption of equitable mootness in *In re Continental Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (en banc) (''*Continental*''), contending that the doctrine is unconstitutional and contrary to the Bankruptcy Code. *Continental* remains the law of this circuit. This panel is not free to overturn a precedential

opinion. In the absence of an en banc reversal, we are bound by *Continental*. Because the District Court abused its discretion under *Continental*, we will reverse the District Court's judgment and remand for consideration of the merits of Appellant's bankruptcy appeal.

## I. Background

The Debtor, a billing services technology company, is a limited liability business and its sole member is Joli, Inc. Joanne Heverly owns seventy-five percent of Joli, Inc., and Richard Brammer, a former officer of the Debtor, owns the remaining twenty-five percent. Appellant, a printing company, holds the single largest claim against the Debtor and the Debtor's CEO, Bruce Heverly, husband of Joanne Heverly, for $9,359,630.91, which stems from a judgment entered in the District Court for the Eastern District of Wisconsin.[1] The Court of Appeals for the Seventh Circuit has since affirmed that judgment. *See Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, 529 F. App'x 784, 793 (7th Cir. 2013).

The Debtor filed a voluntary petition for relief under Chapter 11 of the United State Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). Thereafter, the Office of the United States Trustee formed an official unsecured creditors committee (the "Committee")

---

[1] The Debtor's unsecured claims, not including Appellant's claim, total less than $1.3 million.

4

consisting of Appellant, Ricoh Production Print Solutions, LLC, and Enterprise Group.

Between September 2012 and January 2014, the Debtor filed the First,[2] Second, and Third Amended Plans of Reorganization. After the Bankruptcy Court denied confirmation of the First Amended Plan of Reorganization, Bela Szigethy ("Szigethy") agreed to make an investment in the Debtor.[3] The Debtor filed a Fourth Amended Plan of Reorganization (the "Plan") on January 25, 2013, under which a third-party, One2One Holdings, LLC ("Plan Sponsor") would acquire a membership interest in the Debtor. The Plan incorporated a Plan Support Agreement which provided the Plan Sponsor with the exclusive right to purchase 100% of the Debtor's equity for $200,000. Neither the Plan Sponsor nor any third-party was to contribute any additional capital to fund the Plan. The Plan also incorporated the terms of the Committee Agreement with respect to distributions and the waiver of preference actions against unsecured creditors.

---

[2] The First Amended Plan incorporated an agreement with the Committee (the "Committee Agreement") providing for: (i) a distribution to unsecured creditors of $1.25 million over seven years, (ii) a non-compete clause binding the Heverlys and their relatives until all payments were made to unsecured creditors, and (iii) waiver of preference actions against unsecured creditors.

[3] Szigethy is the founder, co-owner, and Co-CEO of The Riverside Company, a global private equity firm holding over $3 billion in assets.

On March 5, 2013, after holding a five-day confirmation hearing, and over the objection of Appellant, Bankruptcy Judge Winfield entered an order (the "Confirmation Order") confirming the Plan.[4] The Confirmation Order was automatically stayed for fourteen days pursuant to Federal Rule of Bankruptcy Procedure 3020(e). Appellant moved for a stay pending appeal, which was denied. The Bankruptcy Court also denied a request by the Debtor to shorten the automatic fourteen-day stay.[5] The parties briefed the merits of the appeal, but the District Court

---

[4] Appellant, the sole objector to the Plan, opposed confirmation on the basis that, inter alia, the Plan violated the absolute priority rule under 11 U.S.C. § 1129(b) by allowing equity holders to retain property without paying unsecured creditors in full.

[5] On March 18, 2013, Appellant filed Notices of Appeal from the Bankruptcy Court's Confirmation Order and the Bankruptcy Court's Order denying Appellant's motion for a stay pending appeal. On March 19, 2013, the final day of the automatic stay, Appellant filed an emergency application pursuant to Federal Rule of Bankruptcy Procedure 8005 seeking to temporarily stay the Confirmation Order, and requesting that the Court order appellees to show cause as to why a stay pending appeal should not issue. Once the District Court denied its application, Appellant appealed that decision to the Third Circuit, which upheld the denial of the stay. Appellant subsequently sought injunctive relief from the District Court, which was denied pursuant to the law of the case doctrine.

never reached those issues, as it granted the Debtor's motion to dismiss the appeal as equitably moot on June 24, 2013.

## II. Jurisdiction and Standard of Review

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(b). The District Court had jurisdiction under 28 U.S.C. § 158(a). We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291.

We review for abuse of discretion a district court's decision that a bankruptcy appeal is equitably moot. *Continental*, 91 F.3d at 560.

## III. Analysis

### a. Appellant's Challenge to the Equitable Mootness Doctrine

As an initial matter, Appellant asserts that the equitable mootness doctrine is unconstitutional and contrary to the Bankruptcy Code. Because we have already approved the doctrine of equitable mootness in *Continental*,[6] only the

---

[6] It should be noted that nearly all of the other Courts of Appeals with jurisdiction to hear bankruptcy appeals have endorsed some form of the equitable mootness doctrine. *See In re Healthco Int'l, Inc.*, 136 F.3d 45, 48 (1st Cir. 1998); *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir. 2012); *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 713–14 (4th Cir. 2011); *In re Scopac*, 624 F.3d 274, 281–82 (5th Cir. 2010); *In re Am. HomePatient, Inc.*, 420 F.3d 559, 563–65 (6th Cir. 2005); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th

7

Court sitting en banc would have the authority to reevaluate our prior holding. *See United States v. White*, 748 F.3d 507, 512–13 (3d Cir. 2014).[7] This Court may only decline to follow a prior decision of our Court without the necessity of an en banc decision when the prior decision conflicts with a Supreme Court decision. *See Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 94 (3d Cir. 2011); *see also Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (en banc) (Smith, J., concurring) ("'[E]ven in constitutional cases' . . . , the doctrine of stare decisis 'carries such persuasive force' that departing from it has 'always required' some 'special justification.'") (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)).

---

Cir. 1994); *In re Thorpe Insulation Co.*, 677 F.3d 869, 879–83 (9th Cir. 2012); *In re Paige*, 584 F.3d 1327, 1337–38 (10th Cir. 2009); *In re Lett*, 632 F.3d 1216, 1225–26 (11th Cir. 2011); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1147–48 (D.C. Cir. 1986). The Eighth Circuit has yet to address the merits of the doctrine's applicability in a precedential opinion. *Compare In re Nevel Props. Corp.*, 765 F.3d 846, 848 & n.3 (8th Cir. 2014) (affirming on the merits and denying as moot appellee's motion to dismiss the appeal as equitably moot), *with In re President Casinos, Inc.*, 409 F. App'x 31, 31–32 (8th Cir. 2010) (per curiam) (affirming district court's dismissal of bankruptcy appeal as equitably moot).

[7] *See also* 3d Cir. I.O.P. 9.1 (2010) ("[N]o subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

Appellant argues that our equitable mootness jurisprudence should be reevaluated in light of the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Appellant contends that after *Stern,* a bankruptcy court's ability to enter binding, final judgments in "core" bankruptcy proceedings—like plan confirmations—must be subject to district court review on appeal under traditional appellate standards. *Stern* alone does not permit us to depart from *Continental*.

In *Stern*, the Supreme Court granted certiorari to resolve the question of whether 28 U.S.C. § 157(b)(2)(C) is unconstitutional because it gives non-Article III judges the power to render final judgments on common law compulsory counterclaims that are not necessarily resolved in the process of allowing or disallowing the defendant's proof of claim. The Court in *Stern* found that the provision unconstitutionally delegated the judicial power of the United States to non-Article III bankruptcy judges. Justice Roberts's opinion relied heavily on *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855), which stated that with the exception of certain "public rights," Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at common law, or in equity, or admiralty." Because the counterclaim at issue in *Stern* was a tort claim at common law, the Court held that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on [this] state law counterclaim." *Stern*, 131 S. Ct. at 2620.

Thus, the Court in *Stern* made clear that non-Article III bankruptcy judges do not have the constitutional authority to adjudicate a claim that is exclusively based upon a legal right grounded in state law despite appellate review of the

9

bankruptcy judge's decision by an Article III judge. However, *Stern* did not consider the authority of bankruptcy judges to make final determinations regarding other kinds of claims and counterclaims brought by debtors and creditors, nor did *Stern* consider whether Article III requires appellate review of a bankruptcy judge's decisions by an Article III judge. Accordingly, we are obligated to apply this Court's equitable mootness doctrine notwithstanding *Stern*.

### b. Equitable Mootness Analysis

Following confirmation of a reorganization plan by a bankruptcy court, an aggrieved party has the statutory right to appeal the court's ruling. Once a bankruptcy appeal has been filed, federal courts have a '''virtually unflagging obligation''' to exercise the jurisdiction conferred on them. *In re Semcrude, L.P.*, 728 F.3d 314, 320 (3d Cir. 2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Before there is a basis to avoid deciding the merits of an appeal, we must first determine that granting the requested relief is almost certain to produce a ''perverse'' outcome— significant ''injury to third parties'' and/or ''chaos in the bankruptcy court'' from a plan in tatters. *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012). Only in such circumstances is equitable mootness a valid consideration.

A court decides to dismiss an appeal as equitably moot through the consideration of the following ''prudential'' factors:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief

requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Id.* (citing *Continental*, 91 F.3d at 560). Depending on the circumstances, each factor is given varying weight. *Id.* (citing *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000)).

These factors are interconnected and overlapping. *Semcrude*, 728 F.3d at 320 (citing *Phila. Newspapers*, 690 F.3d at 168–69). ''The second factor principally duplicates the first in the sense that a plan cannot be substantially consummated if the appellant has successfully sought a stay.'' *Phila. Newspapers*, 690 F.3d at 169 (internal quotation marks omitted). In analyzing the first factor, courts have considered ''whether allowing an appeal to go forward will undermine the plan, and not merely whether the plan has been substantially consummated under the Bankruptcy Code's definition.''[8] *Id.* at 168–69. This collapses the first and

---

[8] Substantial consummation is defined in the Bankruptcy Code to mean the

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

fourth factors. The third factor adds an additional consideration—whether granting relief will undermine ''the reliance of third parties, in particular investors, on the finality of the transaction.'' *Id.* at 169 (internal quotation marks omitted). ''Finally, the fifth factor supports the other four by encouraging investors and others to rely on confirmation orders, thereby facilitating successful reorganizations by fostering confidence in the finality of confirmed plans.'' *Id.*

Taken together, these factors require that the equitable mootness doctrine be applied only to "prevent[] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 185 (3d Cir. 2001). The party seeking dismissal bears the burden to demonstrate that, weighing the relevant factors, dismissal is warranted. *Semcrude*, 728 F.3d at 321.

In practice, equitable mootness proceeds in two analytical steps: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on the plan's confirmation." *Id.* "Satisfaction of [the] statutory standard indicates that implementation of the plan has progressed to the point that turning back may be imprudent." *Id.*

---

(C) commencement of distribution under the plan.

11 U.S.C. § 1101.

If the confirmed plan has been substantially consummated, a court should next determine whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse. *See In re Zenith Elecs. Corp.*, 329 F.3d 338, 346–47 (3d Cir. 2003) (appeal not equitably moot where disgorgement of professional fees would not unravel plan); *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 228 (3d Cir. 2003) (appeal not equitably moot where striking indemnification provision would leave the plan otherwise intact); *PWS*, 228 F.3d at 236 (appeal not equitably moot where plan could go forward even if certain releases were stricken). A court should also consider the extent a successful appeal, by altering the plan or otherwise, will harm third parties who have acted reasonably in reliance on the finality of plan confirmation. *Semcrude*, 728 F.3d at 321.

### c. Application of the Equitable Mootness Doctrine

Since this Court's adoption of the equitable mootness doctrine in *Continental*, we have emphasized that the doctrine must be construed narrowly and applied in limited circumstances. In *Philadelphia Newspapers*, this Court emphasized "that a court only should apply the equitable mootness doctrine . . . '[in] complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract.'" 690 F.3d at 169 (quoting *Nordhoff*, 258 F.3d at 185). "The doctrine is quite rightly 'limited in scope' and 'cautiously applied.'" *Id.* (quoting *Continental*, 91 F.3d at 559). Further, the doctrine's "judge-made origin, coupled with the responsibility of federal courts to exercise their jurisdictional mandate, obliges us . . . to proceed most carefully before

13

dismissing an appeal as equitably moot." *Semcrude*, 728 F.3d at 318.

Our prior dismissals pursuant to the equitable mootness doctrine are inapposite here. Those prior applications of the doctrine involved complex bankruptcy reorganizations that included multiple related debtors, hundreds of millions of dollars in assets, liabilities and claims, and hundreds or thousands of creditors. For example, *Continental* involved the merger of fifty-three debtors with Continental, a $110 million investment in the reorganized debtor, the transfer by foreign governments of route authorities, and the assumption of leases and executory contracts worth over five billion dollars. 91 F.3d at 567. Similarly, in *Nordhoff*, the reorganization plan required eighteen months of preparation between several parties, the exchange of over $100 million in bonds, the issuance of new stock, the extension of a sixty million dollar credit facility, and the exchange and cancellation of over $100 million of debt. 258 F.3d at 182, 186.

In contrast here, the Debtor's reorganization involved a $200,000 investment in the reorganized debtor and only one secured creditor that held a blanket lien on the Debtor's assets for less than $100,000. Further, the Debtor had only seventeen unsecured creditors, not including insiders. In addition, the Plan did not provide for new financing, mergers or dissolutions of entities, issuance of stock or bonds, name change, change of business location, change in management or any other significant transactions. The record illustrates that this case did not involve a sufficiently complex bankruptcy reorganization such that dismissal on the basis of equitable mootness would be appropriate.

Consideration of the prudential factors also demonstrates that the District Court abused its discretion. The District Court found that the Plan was substantially consummated. The Debtor transferred all property required to be transferred on or shortly after the effective date of the Plan, and the reorganized debtor commenced distributions under the Plan. *See* 11 U.S.C. § 1101(2)(C) (requiring only the "commencement of distribution under the plan"). The District Court observed that Appellant failed to obtain a stay. We do not dispute those determinations. However, the District Court also found that granting relief to Appellant would lead to a perverse outcome by causing the Plan to be fully unraveled, resulting in significant harm to third parties. We disagree. In our judgment, the proper application of the prudential factors does not permit dismissal on equitable mootness grounds.

As noted, the first and fourth prudential factors require that a court consider whether allowing an appeal to go forward will undermine the plan. *Semcrude*, 728 F.3d at 321. In finding that these factors weigh in favor of equitable mootness, the District Court found that Appellant "offered no options which would allow the Court to grant it relief without [unscrambling the Plan] entirely." *In re One 2 One Commc'ns, LLC*, No. 13-1675, 2013 WL 3864056, at *6 (D.N.J. July 24, 2013). In reaching this conclusion, the District Court erred in two fundamental respects: it placed the burden on Appellant to demonstrate that this factor weighed in its favor, and it concluded that because granting Appellant's requested relief would reverse the Plan, this factor necessarily favored the Debtor.

To the contrary, it was the Debtor's burden, as the party seeking dismissal, to demonstrate that the prudential

15

factors weighed in its favor. *See Semcrude*, 728 F.3d at 321. Further, courts are obligated to consider not only whether granting the requested relief would require reversal of the plan, but also whether the plan could be retracted without great difficulty and inequity. *See Nordhoff*, 258 F.3d at 186. We have noted in prior cases that reversal of a confirmation order is more likely to lead to an inequitable result "where the reorganization involves intricate transactions or where outside investors have relied on the confirmation of the plan." *Continental*, 91 F.3d at 560–61 (citations omitted); *see also Nordhoff*, 258 F.3d at 186 (finding that plan that involved hundreds of millions of dollars, the issuance of unretractable bonds, and restructuring the debt, assets, and management of a major corporation "could [not] be reversed without great difficulty and inequity"). We have most frequently found that a plan could not be retracted when the reorganized debtor issued publically traded debt or securities. *See, e.g.*, *Nordhoff*, 258 F.3d at 186.

Here, the Plan did not involve intricate transactions and the Debtor did not present sufficient evidence that the Plan would be difficult to unravel. Instead, the Debtor identified various post-confirmation transactions entered into in the ordinary course of the reorganized Debtor's business. These routine transactions, including the investment by the Plan Sponsor, the commencement of distributions, the hiring of new employees and entering into various agreements with existing and new customers are likely to transpire in almost every bankruptcy reorganization where the appealing party is unsuccessful in obtaining (or fails to seek) a stay. Further, the Plan did not involve the issuance of any publicly traded securities, bonds, or other circumstances that would make it difficult to retract the Plan. Accordingly, the District Court

16

abused its discretion in finding that the first and fourth factors favored the Debtor.

Furthermore, under the third factor, "the reliance by third parties, in particular investors, on the finality of the [Plan's confirmation]" is minimal. *Continental*, 91 F.3d at 562. The District Court articulated no specific harm that would inure to the detriment of third parties and instead stated that, "One2One argues that the relief Appellant seeks would unravel the Plan in its entirety and call into question the continued viability of One2One to the detriment of third parties." *One 2 One Commc'ns*, 2013 WL 3864056, at *8.[9] However, as the District Court noted, "[t]his is not a case where a debtor issued publicly traded securities or debt pursuant to a plan that third parties to the bankruptcy case could have purchased on the open market." *Id.* at *7 (alteration in original) (internal quotation marks omitted). Nevertheless, the Debtor now argues that allowing Appellant's appeal to be heard on the merits would inevitably affect the rights of parties not before the court such as creditors, employees, and third-party workers.

This type of minimal third-party reliance is present in nearly all bankruptcy reorganizations and cannot be characterized as almost certain to cause significant injury to

---

[9] Indeed, the Debtor concedes on appeal that the risk of harm is speculative: "granting the Appellant's requested relief would potentially jeopardize the Reorganized Debtor's successful emergence from chapter 11 and seriously threaten the viability of its ongoing business." Appellee's Br. 42 (quoting App. 3161) (internal quotation marks omitted).

third parties. *Cf. Continental*, 91 F.3d at 556 (emphasizing that the record was replete with evidence that investing parties not before the court relied on the confirmation order in making decision to enter into a $450 million investment agreement under a complex arrangement). In light of the limited evidence of potential third-party injury, the District Court also abused its discretion in determining that this factor favored the Debtor.

Finally, the prudential consideration of public policy weighs in favor of providing Appellant with appellate review of its bankruptcy appeal. "Though the finality of the Bankruptcy Court's decision necessarily will be disturbed," this Court has recognized an appealing party's "statutory right to review of the [Bankruptcy] Court's decision." *Phila. Newspapers*, 690 F.3d at 171. Further, "[t]he presumptive position remains that federal courts should hear and decide on the merits cases properly before them." *Semcrude*, 728 F.3d at 326.

Here, Appellant has repeatedly advanced the contention that it is entitled to appellate review. Appellant objected to the Plan, applied for a stay, filed an appeal of the Confirmation Order and sought emergency appellate review. In light of the other prudential factors, denying Appellant review now would be distinctly inequitable.[10]

---

[10] Appellant also argues on appeal that the District Court abused its discretion by dismissing its appeal of the third-party releases in the Plan. In light of our finding that the District Court abused its discretion in dismissing Appellant's

18

## IV. Conclusion

Absent en banc reconsideration, we cannot entertain Appellant's challenge to equitable mootness, as *Continental* remains the law of this circuit. Because the District Court abused its discretion under *Continental*, we will reverse the District Court's dismissal and remand for its consideration of Appellant's bankruptcy appeal on its merits.

---

entire appeal as equitably moot, we need not consider Appellant's separate argument as to the third-party releases.

*In re: One2One Communications, LLC*, No. 13-3410

KRAUSE, *Circuit Judge*, concurring:

I agree wholeheartedly with the majority's equitable mootness analysis, which we are compelled to undertake under our controlling precedent. I write separately, however, because I do not believe we should persist in our failed attempts to cabin this legally ungrounded and practically unadministrable "judge-made abstention doctrine." *In re Semcrude, L.P.*, 728 F.3d 314, 317 (3d Cir. 2013). Rather, the time has come to reconsider whether it should exist at all, and, if we conclude it should, to reform it substantially.

Although we adopted equitable mootness en banc in *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc), neither the constitutional nor the statutory basis for the doctrine were challenged in that case, and the Court was still nearly evenly divided—with then-Judge Alito leading the dissent. *See id.* at 568 (Alito, J., dissenting). The doctrine was designed to be "limited in scope and cautiously applied," specifically in highly complex cases where limited relief was not feasible and upsetting a reorganization would cause substantial harm to numerous third parties. *Id.* at 559 (majority opinion). In the nearly twenty years since we launched that experiment, it has proved highly problematic, with district courts continuing to dismiss appeals in the simplest of bankruptcies. Further, as courts and litigants (including Appellees) have struggled to identify a statutory basis for the doctrine, it has become painfully apparent that there is none. Moreover, a series of Supreme Court decisions since our adoption of the doctrine makes clear that, whatever doubts we set aside twenty years ago to embrace the doctrine, it cannot survive constitutional scrutiny today. I therefore

urge our Court to consider eliminating, or at the very least, reforming, equitable mootness.

## I.

I begin with our experience with the doctrine. Equitable mootness was intended to "provide[] a vehicle whereby the court can prevent substantial harm to numerous parties," namely where "the reorganization involves intricate transactions or where outside investors have relied on the confirmation of the plan." *Cont'l Airlines*, 91 F.3d at 559-60 (citations omitted). What *Continental Airlines* spawned is a different species altogether. We have repeatedly admonished that the doctrine applies only to attempts to "unscrambl[e] *complex* bankruptcy reorganizations," *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 185 (3d Cir. 2001) (emphasis added),[1] and even then "'is limited in scope and should be cautiously applied,'" *id.* (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000)),[2] as well as that it is inapplicable when limited relief is available on appeal, *Semcrude*, 728 F.3d at 323.[3] Yet district courts have

---

[1] *See also In re Phila. Newspapers*, 690 F.3d 161, 169 (3d Cir. 2012) (reciting *Nordhoff Investments*); *In re Zenith Elecs. Corp.*, 329 F.3d 338, 340 (3d Cir. 2003) (same).

[2] *See also Phila. Newspapers*, 690 F.3d at 170 (reciting the same proposition as stated in *Cont'l Airlines*); *Zenith Elecs. Corp.*, 329 F.3d at 343 (same).

[3] *See also Phila. Newspapers*, 690 F.3d at 170; *Zenith Elecs. Corp.*, 329 F.3d at 346; *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 228 (3d Cir. 2003); *PWS*, 228 F.3d at 236.

continued to invoke the doctrine in modest, non-complex bankruptcies and where appellants have sought limited relief.

We have also rejected invitations to extend equitable mootness outside its intended context, i.e., appeals from confirmation orders. *See In re Diet Drugs*, 582 F.3d 524, 552 n.55 (3d Cir. 2009) (declining to decide whether equitable mootness applied to class settlement); *id* at 557 (Ambro, J., dissenting) (cautioning that extending "the controversial doctrine of equitable mootness, which applies only to attempts to unscrambl[e] complex bankruptcy reorganizations," to class settlement was inappropriate (alteration in original) (internal quotation marks omitted)). But our district courts have not been so discriminating. *See In re Jevic Holding Corp.*, Nos. 13-104 & 13-105, 2014 WL 268613, at *4 (D. Del. Jan. 24, 2014) (applying equitable mootness to dismiss an appeal from an order approving a settlement and structured dismissal). In fact, the doctrine has even been invoked by bankruptcy courts to dismiss motions to revoke reorganization plans. *See, e.g.*, *In re Innovative Clinical Solutions, Ltd.*, 302 B.R. 136, 140-42 (Bankr. D. Del. 2003); *cf. In re Machne Menachem, Inc.*, 371 B.R. 63, 73-75 (Bankr. M.D. Pa. 2006) (applying equitable mootness factors but declining to dismiss on equitable mootness grounds).

Since *Continental Airlines*, we have reversed findings of equitable mootness or declined to dismiss appeals as equitably moot no less than seven times. *See In re SCH Corp.*, 569 F. App'x 119, 122 (3d Cir. 2014) (not precedential) (reversing a finding of equitable mootness); *Semcrude*, 728 F.3d 314 at 323 (same); *Phila. Newspapers*, 690 F.3d at 170 (same); *Zenith Elecs. Corp.*, 329 F.3d at 346 (same); *United Artists*, 315 F.3d at 228 (declining to dismiss as equitably moot an appeal from a district court exercising

3

original jurisdiction over a bankruptcy case); *PWS*, 228 F.3d at 237 (same); *In re Cont'l Airlines* (*Continental II*), 203 F.3d 203, 210 (3d Cir. 2000) (declining to dismiss appeal as equitably moot because the debtor had not preserved the issue, but noting that equitable mootness did not apply).

This case is only the most recent example, but it epitomizes the problem. As the majority explains, what we have is a small, garden-variety bankruptcy. Quad's appeal did not implicate intricate transactions that would be difficult to unravel, nor did it pose a significant risk of injuring third parties. Further, in the event the Plan could not be undone, Quad urged the District Court to grant the limited relief of striking third-party releases from the Plan. The District Court nonetheless dismissed Quad's timely and repeated requests for appellate review on "equitable mootness" grounds. That yet another thoughtful and diligent District Judge has misconstrued our case law as permitting the abdication of jurisdiction in these circumstances reflects a doctrine adrift and in need of reconsideration by our Court.

## II.

So what is the constitutional or statutory anchor for declining to exercise jurisdiction over bankruptcy appeals dubbed "equitably moot"? Simply put, there is none.

The mandate that federal courts hear cases within their statutory jurisdiction is a bedrock principle of our judiciary. As Chief Justice Marshall wrote long ago, "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the [C]onstitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). Dismissing

4

appeals in the name of equitable mootness violates this "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Then-Judge Alito recognized as much in *Continental Airlines*, rebuking the majority for "throw[ing] [the appellants] out of court without reaching the merits of their arguments . . . even though (a) th[e] case [was] clearly not 'moot' in any proper sense of the term, (b) we unquestionably ha[d] statutory jurisdiction, and (c) we have a 'virtually unflagging obligation' to exercise the jurisdiction that we have been given." *Cont'l Airlines*, 91 F.3d at 568 (Alito, J., dissenting) (quoting *Colo. River*, 424 U.S. at 817).

While we have referred to equitable mootness as a "judge-made abstention doctrine," *Semcrude*, 728 F.3d at 317, it is not among the handful of narrow and deeply rooted abstention doctrines recognized by the Supreme Court, namely, *Pullman*, *Burford*, *Younger*, and *Colorado River*.[4]

---

[4] *See Colo. River*, 424 U.S. at 818 (abstaining from hearing cases that are duplicative of a pending state proceeding); *Younger v. Harris*, 401 U.S. 37, 49-54 (1971) (abstaining from hearing cases that would interfere with a pending state criminal proceeding); *Burford v. Sun Oil Co.*, 319 U.S. 315, 333-34 (1943) (abstaining where adjudication in federal court would unduly intrude into the processes of state government or undermine the state's ability to maintain desired uniformity); *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (abstaining from cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law); *see also Quackenbush v.*

Those doctrines, much like the doctrine of *forum non conveniens*, proceed from the premise that "[i]n rare circumstances, federal courts can relinquish their jurisdiction *in favor of another forum*." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722 (1996) (emphasis added).[5] Moreover, the Supreme Court has "on several occasions explicitly recognized that abstention 'does not, of course, involve the abdication of federal jurisdiction, but only the *postponement* of its exercise.'" *England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 465 (1964) (emphasis added) (quoting *Harrison v. NAACP*, 360 U.S. 167, 177 (1959)). But where there is no other forum and and no later exercise of jurisdiction, as in the case of equitable mootness, relinquishing jurisdiction is not abstention; it's abdication. In short, there is no analogue for equitable mootness among the abstention doctrines.

Nor is there a likely prospect of the Supreme Court either taking an expansive view of an existing doctrine to encompass equitable mootness or recognizing equitable mootness as a wholly new abstention doctrine. On the contrary, the Court has repeatedly endeavored to narrow the scope of the abstention doctrines, particularly within the past

---

*Allstate Ins. Co.*, 517 U.S. 706, 716-23 (1996) (explaining the contours of the abstention doctrines).

[5] *See generally* David L. Shapiro, *Jurisdiction and Discretion*, 60 N.Y.U. L. Rev. 543, 548-57, 579-87 (1985) (describing practices of judicial abstention sounding in justiciability, comity, *forum non conveniens*, separation of powers, and other principles and explaining that the range of judges' equitable discretion is affected by governing statutes).

6

few years. In *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584 (2013), for instance, the Court refused to extend the three "exceptional" situations where *Younger* abstention is appropriate, reaffirming Chief Justice Marshall's "early and famous[]" assertion of federal courts' obligation to hear and decide cases within their jurisdiction. *Sprint Commc'ns*, 134 S. Ct. at 590-91 (citing *Cohens*, 6 Wheat. at 404). The Court relied on that assertion again when declining to expand the political question doctrine in *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012), explaining that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Id.* at 1427 (quoting *Cohens*, 6 Wheat. at 404).

And just last year, in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Court confirmed its disapproval of doctrines that permit courts to decline to decide claims on "prudential" rather than statutory or constitutional grounds, admonishing that such doctrines conflict with the Court's "recent reaffirmation [in *Sprint Communications*] of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 1386 (quoting *Sprint Commc'ns*, 134 S. Ct. at 591) (internal quotation marks omitted). After concluding the plaintiff's claim "present[ed] a case or controversy that [was] properly within federal courts' Article III jurisdiction," the Court refused to frame the question before it, which was whether the plaintiff had a cause of action under a federal statute, as a question of "prudential standing" despite using that label in the past. *Id.* at 1386-87. The Court reasoned:

> We do not ask whether in our judgment Congress *should* have authorized [the

plaintiff's] suit, but whether Congress in fact did so. Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because "prudence" dictates.

*Id.* at 1388 (citation omitted).

These recent decisions counsel that equitable mootness is not a logical extension of the narrow abstention doctrines recognized by the Court and will not be viewed favorably as a relatively new prudential one. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 358 (1989) [hereinafter "*NOPSI*"] (explaining that the Court's cases "have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred"). Rather, this judge-made doctrine can survive only if grounded in the Bankruptcy Code or the federal statutes conferring bankruptcy jurisdiction—the subject to which we now turn.

## III.

### A.

The majority opinion in *Continental Airlines* did not engage with any statutory arguments in favor of equitable mootness because none were raised. A review of the statutory language, however, reveals that the Bankruptcy Code and related jurisdictional statutes provide no support for equitable mootness and actually undermine it.

8

Title 28 outlines federal courts' bankruptcy jurisdiction. Section 1334 gives district courts original jurisdiction over bankruptcy cases, while § 157 allows them to refer cases to bankruptcy courts. 28 U.S.C. §§ 157(a), 1334(a). The statute explicitly makes the bankruptcy court's authority to enter orders, including confirmation orders, "subject to review" by the referring district court. *Id.* § 157(b)(1). In turn, § 158 provides that the district courts "shall have jurisdiction to hear appeals" from bankruptcy courts. *Id.* § 158(a). Neither § 157 nor § 158 states or implies that district courts may decline to exercise that jurisdiction by dismissing an appeal as equitably moot.

Appellees point to § 1334(c)(1), which provides that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." *Id.* § 1334(c)(1). That provision, however, provides no support for equitable mootness. To begin, § 1334 cannot be read to authorize district courts to abstain from exercising their appellate jurisdiction when it refers to the *original jurisdiction* of the district courts, not to appellate jurisdiction at all. *See id.* § 1334(a); *In re Mystic Tank Lines Corp.*, 544 F.3d 524, 528 (3d Cir. 2008).

Moreover, § 1334 allows abstention "in the interest of justice, or in the interest of comity with State courts or respect for State law." Equitable mootness no doubt does not involve the latter. As to the former, it could be argued that preserving a reorganization plan may serve the "interest of justice." But how is it "just" to bar a potentially meritorious appeal when an appellate court—*after* hearing the merits of the appeal—

9

instead could use its equitable authority to fashion a limited remedy while still protecting third parties that may be harmed if a plan is undone? *See Semcrude*, 728 F.3d at 324-25 (citing *Cont'l Airlines*, 91 F.3d at 571-72 (Alito, J., dissenting)) ("[T]he feared consequences of a successful appeal are often more appropriately dealt with by fashioning limited relief at the remedial stage than by refusing to hear the merits of an appeal at its outset."); *see also NOPSI*, 491 U.S. at 358-59 (noting that while federal courts "lack the authority to abstain from the exercise of jurisdiction that has been conferred," they retain "discretion in determining whether to grant certain types of relief").

Additionally, if § 1334(c) were the basis for equitable mootness, our construction of the doctrine (and every other Circuit's) would violate § 1334(d), which provides: "Any decision to abstain or not to abstain made under subsection (c) . . . *is not reviewable by appeal or otherwise by the court of appeals* under section 158(d), 1291, or 1292 of this title *or by the Supreme Court of the United States* under section 1254 of this title." 28 U.S.C. § 1334(d) (emphasis added).[6] Yet we have never interpreted § 1334 to bar our review of district court orders dismissing bankruptcy appeals on equitable mootness grounds. On the contrary, dating back to *Continental Airlines*, we have not only reviewed such decisions, but have often reversed them. Thus, interpreting § 1334(c) as the statutory basis for equitable mootness would

---

[6] Section 1334(d) operates much like § 1447(d), which precludes review of orders remanding removed cases to state court. *See* 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . . .").

be incompatible with our case law, as well as the language and structure of § 1334.

Finally, the legislative history of § 1334(c) is devoid of any mention of equitable mootness. It indicates the provision was enacted to respond to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), and to avoid constitutional concerns with having state law claims resolved in federal courts. *See* H.R. Rep. No. 98-882 (1984), *reprinted in* 1984 U.S.C.C.A.N. 576, 1984 WL 37391. The Supreme Court's interpretation of § 1334 in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), reinforces that Congress's intent was to authorize bankruptcy courts to abstain from hearing state law claims in certain circumstances—not to allow district courts to abdicate their appellate jurisdiction:

> [T]he framework Congress adopted in the 1984 Act . . . contemplates that certain state law matters in bankruptcy cases will be resolved by judges other than those of the bankruptcy courts. Section 1334(c)(2), for example, requires that bankruptcy courts abstain from hearing specified non-core, state law claims that "can be timely adjudicated[ ] in a State forum of appropriate jurisdiction." Section 1334(c)(1) similarly provides that bankruptcy courts may abstain from hearing any proceeding, including core matters, "in the interest of comity with State courts or respect for State law."

*Id.* at 2619-20 (second alteration in original). Thus, the language, structure, and legislative history of § 1334, as well as its interpretation by the Supreme Court, indicate that

11

Congress did not intend an equitable mootness exception to the federal courts' appellate jurisdiction in bankruptcy cases.

Appellees urge that the "most plausible" basis for the doctrine is that the Bankruptcy Code "express[es] a policy favoring the finality of bankruptcy decisions" through 11 U.S.C. §§ 363(m),[7] 364(e),[8] and 1127(b),[9] and equitable

---

[7] Section 363(m) provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).

[8] Section 364(e) provides: "The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e).

[9] Section 1127(b) provides: "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified

12

mootness fills a gap in the Code created by the absence of a provision limiting appellate review of plan confirmation orders. *Semcrude*, 728 F.3d at 317-18. But then-Judge Alito aptly explained why we should reject this argument in his *Continental Airlines* dissent: "[N]arrow provisions" such as §§ 363(m) and 364(e), "which merely prevent the upsetting of certain *specific* transactions if stays are not obtained," cannot support the broad doctrine of equitable mootness. 91 F.3d at 570 (Alito, J., dissenting) (emphasis added). By their terms, §§ 363(m) and 364(e) do not prevent an appellate court from *hearing* an appeal, or even from granting a particular remedy; they simply prevent the appellate court's remedy from affecting certain transactions. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998). Section 1127(b) provides even less support for equitable mootness, as it only restricts a *party's* ability to modify a plan before confirmation; it says nothing about the powers of bankruptcy courts or appellate courts.

Moreover, rather than establish a general "policy" supporting equitable mootness, these provisions weigh *against* the doctrine. Because Congress specified certain orders that cannot be disturbed on appeal absent a stay, basic canons of statutory construction compel us to presume that Congress did *not* intend for other orders to be immune from appeal. *See Russello v. United States*, 464 U.S. 16, 23 (1983); *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-17 (1980). While the federal courts must fill statutory gaps in some

under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title." 11 U.S.C. § 1127(b).

exceptional circumstances, *see, e.g.*, *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593 (1973), we may not stretch a statute to create such gaps, and we generally acknowledge gaps to provide relief, not to deny relief which is the consequence of denying appellate review.

**B.**

Even if there were a reading of the statute that supported equitable mootness, we would be compelled to reject it because of the serious constitutional questions that reading would raise. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Sandoval v. Reno*, 166 F.3d 225, 237 (3d Cir. 1999).

Article III of the Constitution imposes certain requirements on officials who exercise the judicial power of the United States, U.S. Const. art. III § 1, but Congress often charges officials who are not required to meet those criteria with ruling on certain kinds of claims. Adjudication by such non-Article III tribunals, including bankruptcy courts, raises two distinct constitutional concerns. The first is the infringement on a litigant's "entitlement to an Article III adjudicator," a personal right recently reaffirmed in *Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944 (2015). While that right can be waived, *id.*, bankruptcy appellants whose appeals are dismissed as equitably moot clearly do not do so. Moreover, because they lack an alternative forum in which to pursue their claims against a debtor, most creditors do not truly consent to bankruptcy adjudication in the first place, *see Stern*, 131 S. Ct. at 2614, let alone adjudication without any appellate review.

The second is a non-waivable, structural concern that a "congressional decision to authorize the adjudication of Article III business in a non-Article III tribunal" would "impermissibly threaten[] the institutional integrity of the Judicial Branch." *Commodity Futures Trading Comm'n v.*

15

*Schor*, 478 U.S. 833, 851 (1986); *see Wellness Int'l*, 135 S. Ct. at 1944.  In determining whether such an intrusion occurs, the Court scrutinizes among other things "the extent to which the 'essential attributes of judicial power' are reserved to Article III courts." *Schor*, 478 U.S. at 851.  Appellate review by an Article III judge is crucial to that determination.  *See, e.g.*, *id.* at 853.[10]

Accordingly, over eighty years ago in *Crowell v. Benson*, 285 U.S. 22 (1932), the Supreme Court upheld a system of adjudication by an administrative agency on the rationale that "the reservation of full authority to [an Article III] court to deal with matters of law provide[d] for the appropriate exercise of the judicial function." *Id.* at 54.  The availability of Article III review was also essential to the Court's approvals of agency adjudications in *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593 (1985), and *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 853 (1986).  Similarly, in *United States v. Raddatz*, 447 U.S. 667 (1980), the Court upheld decision-making by magistrate judges only because "the ultimate decision is made by the district court." *Id.* at 683; *see also Northern Pipeline*, 458 U.S. at 83 ("Critical to the Court's decision to uphold the Magistrates Act was the fact that the ultimate decision was made by the district court.").

---

[10] One prominent commentator has argued that review by an Article III judge is both necessary and sufficient to uphold adjudication by any non-Article III judge.  *See* Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 915, 916 (1988).

Applying these principles in the bankruptcy context, the Supreme Court held in *Northern Pipeline* and *Stern* that because a bankruptcy court is not an Article III court, it may not enter final judgments regarding certain kinds of claims (which have since been dubbed "*Stern* claims") even when the bankruptcy judge's decision will be reviewed on appeal by an Article III judge. *See Stern*, 131 S. Ct. at 2620; *Northern Pipeline*, 458 U.S. at 86-87 (plurality opinion); *see also id.* at 91 (Rehnquist, J., concurring in the judgment). Most recently, in *Wellness International*, the Court approved adjudication of *Stern* claims by bankruptcy judges where the parties consent, but explicitly premised its decision on the existence of appellate review by Article III courts, reasoning that "allowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers *so long as* Article III courts retain supervisory authority over the process." 135 S. Ct. at 1944 (emphasis added).

Equitable mootness drastically weakens that supervisory authority, and therefore threatens a far greater "impermissibl[e] intru[sion] on the province of the judiciary," *Schor*, 478 U.S. at 851-52, than the Court confronted in *Northern Pipeline*, *Stern*, or *Wellness International*. The doctrine not only prevents appellate review of a non-Article III judge's decision; it effectively delegates the power to prevent that review to the very non-Article III tribunal whose decision is at issue. Although Article III judges decide whether an appeal is equitably moot, bankruptcy courts control nearly all of the variables in the equation, including whether a reorganization plan is initially approved, whether a stay of plan implementation is granted, whether settlements or releases crucial to a plan are approved and executed, whether

17

property is transferred, whether new entities (in which third parties may invest) are formed, and whether distributions (including to third parties) under the plan begin—all before plan challengers reach an Article III court.

Put another way, whereas magistrate judges' and administrative agencies' decisions are at least subject to appellate review, equitable mootness not only allows bankruptcy court decisions to avoid review, but also enables bankruptcy judges to insulate their decisions from review at their discretion. In turn, opportunistic plan proponents can (and as discussed below, regularly do) use this to their advantage. As then-Judge Alito warned in *Nordhoff Investments*, "our court's equitable mootness doctrine can easily be used as a weapon to prevent any appellate review of bankruptcy court orders confirming reorganization plans. It thus places far too much power in the hands of bankruptcy judges." 258 F.3d at 192 (Alito, J., concurring in the judgment).

While historical precedent can justify a delegation of judicial power to a non-Article III tribunal,[11] equitable

---

[11] *See Northern Pipeline*, 458 U.S. at 70 (plurality opinion) ("In sum, this Court has identified three situations in which Art. III does not bar the creation of legislative courts. In each of these situations, the Court has recognized certain exceptional powers bestowed upon Congress by the Constitution or by historical consensus. Only in the face of such an exceptional grant of power has the Court declined to hold the authority of Congress subject to the general prescriptions of Art. III."); *see also Stern*, 131 S. Ct. at 2621 (Scalia, J., concurring) (citing Thomas E. Plank, *Why Bankruptcy Judges Need Not and Should Not Be Article III*

---

mootness cannot lay claim to such historical support. Despite the doctrine's recent acceptance by district courts and courts of appeals, the decisions of bankruptcy commissioners, referees, and, most recently, judges have always been subject to review in courts of law or equity.[12] Abdicating that review is a modern trend not started by Congress or the Supreme Court.

At the very least, equitable mootness raises serious constitutional concerns by failing to provide appellate review of bankruptcy judges' decisions in an Article III court—a protection that was present, yet ultimately insufficient to cure similar concerns in *Northern Pipeline* and *Stern*. With no indication that Congress or the Supreme Court has authorized an exception to our "virtually unflagging obligation" to exercise our jurisdiction that supports equitable mootness, it is not hard to see why the six dissenting members of our Court in *Continental Airlines* were "puzzled and troubled" by our adoption of the doctrine without any analysis of its origins. 91 F.3d at 568 (Alito, J., dissenting).

## IV.

Beyond the issues with equitable mootness's legitimacy, I also question its efficacy. The doctrine was intended to promote finality, but it has proven far more likely to promote uncertainty and delay. Ironically, as Chief Judge

---

*Judges*, 72 Am. Bankr. L.J. 567, 607-09 (1998)) (positing that "[p]erhaps historical practice permits non-Article III judges to process claims against the bankruptcy estate," but declining to reach the issue).

[12] *See* Plank, *supra* note 11, at 574.

McKee noted at oral argument in this case, a motion to dismiss an appeal as equitably moot has become "part of the Plan."[13] Proponents of reorganization plans now rush to implement them so they may avail themselves of an equitable mootness defense, much like Appellees did here.[14] Rather than litigate the merits of an appeal, parties then litigate equitable mootness. And even if an appeal is dismissed as equitably moot by a district court, that dismissal is appealed to our Court, often resulting, in turn, in a remand and further proceedings.

---

[13] Oral Argument at 48:05-49:35, *available at* http://www.ca3.uscourts.gov/oral-argument-recordings.

[14] Appellees closed the transactions contemplated by the Plan and began distributions under the Plan the day the Plan took effect, March 21, 2013. App. 1522. Even before that, however, Appellees advised the District Court that they intended to move to dismiss Quad's appeal as equitably moot, specifically, two days before the Plan took effect during a hearing on Quad's emergency motion for a stay pending appeal. App. 1519; *see also* Oral Argument at 48:05-48:40, *available at* http://www.ca3.uscourts.gov/oral-argument-recordings. One month later, Appellees again argued the appeal was equitably moot during a hearing on Quad's preliminary injunction motion, which was before the appeal had been briefed. App. 3226. This is the same kind of opportunistic conduct that worried then-Judge Alito in *Nordhoff Investments*. *See* 258 F.3d at 191 (Alito, J., concurring in the judgment) ("It is disturbing that Zenith, in a seeming attempt to moot any appeal prior to filing, succeeded in implementing most of the plan before the appellants even received notice that the plan had been confirmed.").

20

This appeal proves the point. The Bankruptcy Court approved the Plan on March 5, 2013. Quad then made multiple unsuccessful attempts to obtain a stay from the Bankruptcy Court and the District Court, eventually filing its brief on appeal in the District Court on May 23, about two months after the Plan took effect. One2One filed its brief in response about two weeks later, and then filed its motion to dismiss the appeal as equitably moot the next day. All of the briefing on both the merits and the motion to dismiss was complete by June 25, 2013. Because the appeal was dismissed on equitable mootness grounds, however, we find ourselves, nearly two years later and after the parties have expended considerable resources on full briefing and argument before this Court, concluding that the District Court improperly applied the equitable mootness factors and remanding for a ruling on the merits—a ruling that itself eventually may be appealed.

How, then, does refusing to hear the merits of the appeal achieve finality? Even if we were affirming the District Court's finding of equitable mootness, there would not have been finality until this point, as the possibility of reversal has loomed all along. Without the equitable mootness doctrine, on the other hand, the District Court would have ruled on the merits long ago.

Even if the doctrine worked as intended and consistently promoted finality, its deleterious effect on our system of bankruptcy adjudication presents an independent reason to reject it. By excising appellate review, equitable mootness not only tends to insulate errors by bankruptcy judges or district courts, but also stunts the development of

21

uniformity in the law of bankruptcy.[15] Moreover, the significant consequences of a confirmation order, as recently recited by the Supreme Court, necessitate appellate review:

> [P]lan confirmation . . . alters the status quo and fixes the rights and obligations of the parties. When the bankruptcy court confirms a plan, its terms become binding on debtor and creditor alike. Confirmation has preclusive effect, foreclosing relitigation of any issue actually litigated by the parties and any issue necessarily determined by the confirmation order. Subject to certain exceptions, confirmation vests all of the property of the bankruptcy estate in the debtor, and renders that property free and clear of any claim or interest of any creditor provided for by the plan. Confirmation also triggers the Chapter 13 trustee's duty to distribute to creditors those funds already received from the debtor.

---

[15] Indeed, the desire for clarity and uniformity led Congress to enact 28 U.S.C. § 158(d)(2), the "new statutory provision for certification of bankruptcy appeals directly to the courts of appeals." *See In re Pac. Lumber Co.*, 584 F.3d 229, 241 (5th Cir. 2009). "The twin purposes of the provision were to expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy." *Id.* at 241-42 (citing H.R. Rep. No. 109-31 pt. I, at 148 (2005), *as reprinted in* 2005 U.C.C.C.A.N. 88, 206)).

*Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015) (alterations, citations, and internal quotation marks omitted).

Particularly troubling are dismissals of appeals challenging plans that "classify similar claims differently in order to gerrymander an affirmative vote on reorganization." *In re Pac. Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009) (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)) (internal quotation mark omitted). Even if appellants challenging such violations can demonstrate "apparent arbitrariness" in the treatment of different creditors, courts are likely to find their appeals equitably moot, as often "no remedy . . . is practicable other than unwinding the plan." *Id.*; *accord In re Charter Commc'ns* 691 F.3d 476, 487-88 (2d Cir. 2012). Under such circumstances, equitable mootness merely serves as part of a blueprint for implementing a questionable plan that favors certain creditors over others without oversight by Article III judges.[16] In short, even equitable and prudential concerns weigh against equitable mootness.

---

[16] *See* Brief of Bankruptcy Law Professors in Support of Granting the Petition for Certiorari at 5, *Law Debenture Trust Co. of N.Y. v. Charter Commc'ns, Inc.*, 133 S. Ct. 2021 (2013) (No. 12-847), 2013 WL 543337 [hereinafter "Brief of Bankruptcy Law Professors"] ("[S]ophisticated parties have learned that a 'pre-packaged' reorganization plan that is designed to be consummated over a weekend may be insulated from review by an Article III court even though the plan contains terms that would be determined to be unlawful if the plan were subjected to judicial review, and those parties are increasingly exploiting that opportunity."); Ryan M. Murphy, *Equitable Mootness Should Be Used as a Scalpel*

**V.**

We must consider whether to end or endure the mischief of equitable mootness. Although the doctrine has been accepted de facto across the Circuits, its legitimacy has rarely been scrutinized,[17] and this appeal appears to be the first in our Circuit in which an appellant has properly preserved and disputed the validity of equitable mootness under the Bankruptcy Code, the federal statutes conferring bankruptcy jurisdiction, and the Constitution. In fact, aside from numerous petitions for certiorari, the doctrine has gone virtually unchallenged.[18] This may be because litigants—and

_Rather than an Axe in Bankruptcy Appeals_, 19 J. Bankr. L. & Prac. 1 Art. 2 (2010) ("[T]he importance of substantial consummation in rendering a claim equitably moot raises concerns that a debtor can 'stack the deck' in its favor to expedite implementation of its plan and foreclose review of questionable plan components.").

[17] _See Semcrude_, 728 F.3d at 317 ("Courts have rarely analyzed the source of their authority to refuse to hear an appeal on equitable mootness grounds."); Murphy, _supra_ note 16 ("In light of the analysis provided by the dissent in _Continental Airlines_ and the scarcity of opinions that tackle the question of the origin of equitable mootness, it is difficult to discern a coherent underlying rationale that justifies such a radical concept." (footnote omitted)).

[18] It is therefore not surprising that the Supreme Court has denied those petitions, as the courts of appeals have rarely grappled with the doctrine's constitutional and statutory

24

bankruptcy attorneys—wield the weapon of equitable mootness just as often as they suffer its blows. But it is time for the challenge, and I am not alone in urging it. A coalition of bankruptcy law professors and the United States Government have both urged the Supreme Court to hear challenges to equitable mootness.[19] In any event, the doctrine's widespread acceptance, standing alone, does not establish its validity. After all, the system of bankruptcy

---

underpinnings. Regardless, there is no basis for Appellees' contention that the Supreme Court's denial of certiorari reflects the Court's tacit approval of the equitable mootness doctrine. As the Court "ha[s] often stated, the denial of a writ of certiorari imports no expression of opinion upon the merits of the case. The variety of considerations [that] underlie denials of the writ counsels against according denials of certiorari any precedential value." *Teague v. Lane*, 489 U.S. 288, 296 (1989) (second alteration in original) (citations and internal quotation marks omitted); *accord United States ex rel. Smith v. Baldi*, 192 F.2d 540, 544 (3d Cir. 1951) (reciting the "well established rule that a denial of certiorari does not prove anything except that certiorari was denied").

[19] *See* Brief of Bankruptcy Law Professors, *supra* note 16, at 2; Petition for a Writ of Certiorari, *United States v. GWI PCS 1, Inc.*, 533 U.S. 964 (2001) (No. 00-1621), 2001 WL 34124814.

adjudication struck down in *Stern* had been unanimously upheld by district courts and courts of appeals.[20]

Moreover, principles of stare decisis do not compel us to continue on this course. "Revisiting precedent is particularly appropriate where, as here, . . . the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent's shortcomings," *Pearson v. Callahan*, 555 U.S. 223, 233 (2009), and where "subsequent legal developments have unmoored the case from its doctrinal anchors," *Morrow v. Balaski*, 719 F.3d 160, 180 (3d Cir. 2013) (en banc) (Smith, J., concurring); *see Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("[W]e have overruled our precedents when subsequent cases have undermined their doctrinal underpinnings."); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 900 (2007) (quoting *Dickerson* and collecting cases). Considering that equitable mootness barely had doctrinal anchors to begin with, our dismal experience with it obliges us to reconsider *Continental Airlines*.

While proponents of the doctrine will emphasize its practical importance to the administration of bankruptcy estates, there are effective alternatives that do not suffer from the prudential, statutory, and constitutional defects of equitable mootness. For instance, in an appropriate case, parties can deploy the equitable defense of laches, which requires "establish[ing] (1) an inexcusable delay in bringing

---

[20] *See* Brook E. Gotberg, *Restructuring the Bankruptcy System: A Strategic Response to* Stern v. Marshall, 87 Am. Bankr. L.J. 191, 205 & n.74 (2013).

the action and (2) prejudice." *In re Mushroom Transp. Co.*, 382 F.3d 325, 337 (3d Cir. 2004) (quoting *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir. 1999)) (internal quotation mark omitted). Similarly, where an appellant's bad faith delay prejudices other parties, courts have discretion to impose an appropriate remedy, including dismissal. *See In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006) (Sotomayor, J.); *In re SPR Corp.*, 45 F.3d 70, 74 (4th Cir. 1995); *In re Comer*, 716 F.2d 168, 177 (3d Cir. 1983); *see also* Fed. R. Bankr. P. 8003(a)(2) ("An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the district court or BAP to act as it considers appropriate, including dismissing the appeal."). And, of course, appellate courts can expedite briefing schedules and issue orders with necessary instructions for the parties and bankruptcy courts in advance of full opinions.

More broadly, courts can address the concerns behind equitable mootness, including the extent to which granting requested relief will "fatally scramble" an otherwise lawful plan or "significantly harm third parties who have justifiably relied on the plan's confirmation," in fashioning an appropriate remedy, rather than abstaining from exercising their jurisdiction. *Semcrude*, 728 F.3d at 321; *see also id.* at 324-25 (citing *Cont'l Airlines*, 91 F.3d at 571-72 (Alito, J., dissenting)) ("As then-Judge Alito explained, the feared consequences of a successful appeal are often more appropriately dealt with by fashioning limited relief at the remedial stage than by refusing to hear the merits of an appeal at its outset.").

In many cases, district courts may conclude that all or substantially all of the relief requested is feasible despite the

plan's consummation.  *See In re Res. Tech. Corp.*, 430 F.3d 884, 886-87 (7th Cir. 2005) (Easterbrook, J.) ("Unscrambling a transaction may be difficult, but it can be done.  No one (to our knowledge) thinks that an antitrust or corporate-law challenge to a merger becomes moot as soon as the deal is consummated.  Courts can and do order divestiture or damages in such situations."); *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) (Easterbrook, J.) ("Money had changed hands and, we are told, cannot be refunded.  But why not? Reversing preferential transfers is an ordinary feature of bankruptcy practice, often continuing under a confirmed plan of reorganization." (citation omitted)); *Matter of Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (Posner, J.) ("We could order the bankruptcy judge to modify the plan of reorganization to reallocate $20 million worth of the stock that the 14% noteholders received to the appellants, the 13.5% noteholders.  Some of the 14% noteholders, it is true, have already sold their stock, but they could be ordered to surrender some or all of the proceeds to the appellants.").

In other cases, the interests of finality and protecting third parties will weigh against granting an appellant's requested relief in its entirety.  The availability of only limited relief, however, should not prevent adjudication on the merits.  "[T]otal relief . . . is not essential to jurisdiction," as "relatively few plaintiffs get *all* they are seeking in their lawsuit." *Envirodyne*, 29 F.3d at 304.  Even if a "bankruptcy court might determine that full relief is no longer available to [appellants] after substantial consummation," certainly appellants "would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of [their] appeal as a whole." *In re Chateaugay Corp.*, 10 F.3d 944, 954 (2d Cir.

28

1993).

Accordingly, several courts have analyzed equitable mootness only after addressing the merits, including the Seventh Circuit in *Envirodyne*, a decision written by Judge Posner. There, following Judge Easterbrook's decision in *In re UNR Industries, Inc.*, 20 F.3d 766, 769 (7th Cir. 1994), which banished the term "equitable mootness" from that Circuit, the court reasoned that the "[t]he now nameless doctrine is perhaps best described as merely an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties" and "not a jurisdictional doctrine." *Envirodyne*, 29 F.3d at 304 (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 375 (1977)). As such, the court "elide[d] the question of [the doctrine's] applicability" and affirmed the bankruptcy appeal before it on the merits. *Id.*[21]

---

[21] *See also SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (affirming on the merits rather than analyzing equitable mootness); *UNR*, 20 F.3d at 770 (considering whether plan challengers had demonstrated a "powerful reason" to alter a reorganization plan); *cf. United States v. Buchman*, 646 F.3d 409, 411 (7th Cir. 2011) (Easterbrook, C.J.) ("Circuits that use [the equitable mootness] doctrine dismiss an appeal once a bankruptcy auction has been completed or a plan of reorganization confirmed and implemented without a stay. But this circuit does not follow that approach. We have held that the possibility of financial adjustments among the parties keeps a proceeding alive even if the sale cannot be upset and rights under a plan of reorganization cannot be revised."); *United States v. Segal*, 432 F.3d 767, 774 (7th Cir. 2005) ("[W]hile

29

At least two courts have followed Judge Posner's lead. In *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), a Second Circuit panel analyzed the merits of an appeal before equitable mootness, reasoning that "[b]ecause equitable mootness bears only upon the proper remedy, and does not raise a threshold question of our power to rule, a court is not inhibited from considering the merits before considering equitable mootness." *Id.* at 144 (citing *Envirodyne*, 29 F.3d at 303-04). The court further observed that "[o]ften, an appraisal of the merits is essential to the framing of an equitable remedy." *Id.* And the Fourth Circuit, in its most recent equitable mootness decision, cited *Metromedia* in adopting the same approach. *Behrmann v. Nat'l Heritage Foundation*, 663 F.3d 704, 713 n.3 (4th Cir. 2011).

Considering the equities after the merits, at the remedial stage, offers several advantages over abstaining from hearing the appeal altogether. In many cases, deciding the merits of a bankruptcy appeal may require the same if not less effort than deciding equitable mootness, especially given that a bankruptcy judge's findings of fact are reviewed for clear error. If so, a court can conserve resources by ruling first on the merits, as the court did in *Envirodyne*. *See* 29 F.3d at 304. If not, requiring a ruling on the merits can at

---

we are concerned about trying to unwind the settlement, it is difficult to determine the precise effects of such an action . . . . This prevents us from conclusively holding that the settlement was so complex or that the changes after the settlement have been so sweeping that it would be foolish for us to even consider reversing the deal. Therefore, with some reservations, we move on.").

30

least prevent one cycle of appeals (as a ruling by the District Court on the merits of Quad's appeal might have obviated the need for a remand here).[22]

Even in an exceptional case, like *Continental Airlines*, where a court arguably cannot grant any relief without inequitably harming innocent parties, having a decision on the merits is beneficial. In *Metromedia*, for instance, the Second Circuit determined that the bankruptcy court had improperly approved certain nondebtor releases, but ultimately concluded it would be inequitable to grant relief considering that the appellants had not sought a stay and "none of the completed transactions c[ould] be undone without violence to the overall arrangements." 416 F.3d at 144-45. Nevertheless, the court's decision on the merits has been cited numerous times by courts analyzing similar provisions in reorganization plans. *See, e.g.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1061 (5th Cir. 2012) (relying on *Metromedia* in analyzing nondebtor releases); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014) (same). Thus, a ruling on the merits of a bankruptcy appeal will promote accuracy and uniformity in the law of bankruptcy even if the reviewing court finds it impossible to fashion an appropriate remedy.

---

[22] As a recent example, in *In re Jevic Holding Corp.*, --- F.3d ----, No. 14-1465, 2015 WL 2403443 (3d Cir. May 21, 2015), the district court there ruled on both the merits of the appeal before it and equitable mootness. We did not address equitable mootness, but rather affirmed on the merits. Had the district court not ruled on the merits, we might have had to remand for further proceedings. *See id.* at *9; *see also id.* at *11 (Scirica, J., concurring in part and dissenting in part) (agreeing that equitable mootness did not apply).

31

Such cases should be exceedingly rare, however, because as long as any remedy, including monetary relief, is available, an appellant's claims are "not 'moot' in any proper sense of the term," *Cont'l Airlines*, 91 F.3d at 568 (Alito, J., dissenting), and should be heard on their merits. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (reasoning that a case is not moot where a plaintiff seeks monetary relief in their complaint); *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (explaining that a case is not moot where, although "a court may not be able to return the parties to the *status quo ante*," it "can fashion *some* form of meaningful relief"); *see also* 13C Charles Alan Wright et al., Federal Practice & Procedure § 3533.3 (3d ed. 2015) ("Untold numbers of cases illustrate the rule that a claim for money damages is not moot . . . .").

## VI.

Even if we decide not to revisit equitable mootness, we should delineate its contours more precisely and provide clearer guidance to the district courts on its appropriate use. We made valiant efforts in *Semcrude*, where we placed the burden of demonstrating equitable mootness on the party seeking dismissal, emphasized that speculative "Chicken Little" statements prophesizing harm to a plan or to third parties cannot fulfill that burden, and stressed that "[t]he presumptive position remains that federal courts should hear and decide on the merits cases properly before them." 728 F.3d at 321-22, 324-26. But the persistent problems in the doctrine's application by district courts reflect that more must be done, and there are at least four reforms we could consider if we opted to maintain equitable mootness as an abstention doctrine.

First, we could place greater weight on an appellant's attempts to obtain a stay, perhaps permitting dismissal only where an appellant does not seek one.[23] In such cases, we can fairly say "the appealing party should have acted before the plan became extremely difficult to retract." *Nordhoff Invs.*, 258 F.3d at 185 (majority opinion). Indeed, every time we

---

[23] The inequity of granting relief where an appellant has been less than diligent in obtaining a stay motivated the earliest equitable mootness decisions. *See, e.g.*, *In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir. 1981). More recent decisions from other Circuits have also placed great weight on a failure to seek a stay. *See, e.g.*, *In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012); *In re Paige*, 584 F.3d 1327, 1341 (10th Cir. 2009); *Metromedia*, 416 F.3d at 144.

have affirmed a finding of equitable mootness after *Continental Airlines*, the appellant failed to file a motion for a stay. *See In re SemCrude L.P.*, 456 F. App'x 167, 171 (3d Cir. 2012) (not precedential) (appellant made an oral motion for a stay in the bankruptcy court, but never filed a written motion or made any other attempts to obtain a stay); *In re Genesis Health Ventures, Inc.*, 204 F. App'x 144, 146 (3d Cir. 2006) (not precedential) (appellant made no attempt to obtain a stay); *In re SGPA, Inc.*, 34 F. App'x 49, 52 (3d Cir. 2002) (not precedential) (same); *Nordhoff Invs.*, 258 F.3d at 185 (same); *see also id.* at 191-92 (Alito, J., concurring in the judgment) (agreeing that an appeal was equitably moot "primarily" because the appellants had failed to seek a stay).

Second, we could clarify what constitutes "significant[] harm" to "third parties who have justifiably relied on plan confirmation." *Semcrude*, 728 F.3d at 321. Specifically, who is a "third party," and when is their reliance "justifiable"? While we should be hesitant to grant relief where the effects on third parties would be inequitable, we may be less concerned where purported third parties have had the opportunity to participate in the bankruptcy proceedings or on appeal. Just as opponents of a reorganization plan must diligently pursue their claims, so must plan proponents. *See Charter Commc'ns*, 691 F.3d at 484 ("[T]he relief [Appellants] seek would not adversely affect parties without an *opportunity* to participate in the appeal . . . . Even assuming that the relief requested would send Charter back into bankruptcy, the parties most affected . . . are either parties to this appeal or participated actively in the bankruptcy proceedings." (emphasis added) (citation omitted)); *Paige*, 584 F.3d at 1344 ("[B]ecause of ConsumerInfo's pivotal role in the bankruptcy proceedings, it

34

is hard to consider it a 'third party' or at least an innocent third party.").

And we should be even less solicitous of parties who act opportunistically or advocate unlawful plan provisions during confirmation. *See Charter Commc'ns*, 691 F.3d at 484 ("[I]f the Allen Settlement were unlawful, it would not be inequitable to require the parties to that agreement to disgorge their ill-gotten gains, participation in the appeal or not."); *Paige*, 584 F.3d at 1343 ("[W]here . . . the parties attempting to convince the court not to reach the merits have accelerated the consummation of the plan despite their knowledge of a pending appeal . . . we are less inclined to grant their wish that the court abstain from reaching the merits on appeal."); *Pac. Lumber Co.*, 584 F.3d at 244 ("That there might be adverse consequences to MRC/Marathon is not only a natural result of any ordinary appeal—one side goes away disappointed—but adverse appellate consequences were foreseeable to them as sophisticated investors who opted to press the limits of bankruptcy confirmation and valuation rules."); *id.* at 244 n.19 ("Equitable mootness should protect legitimate expectation of parties to bankruptcy cases but should not be a shield for sharp or unauthorized practices.").

Third, we could reconsider our standard of review of determinations of equitable mootness. While we opted for abuse of discretion review in *Continental Airlines*, several Circuits apply de novo review instead. *See In re United Producers, Inc.*, 526 F.3d 942, 946 (6th Cir. 2007); *In re GWI PCS 1 Inc.*, 230 F.3d 788, 799-800 (5th Cir. 2000); *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1351 (9th Cir. 1994); *In*

*re Club Assocs.*, 956 F.2d 1065, 1069 (11th Cir. 1992).[24] The *Continental Airlines* dissent argued that we chose the wrong side of this split, as "there is an unbroken and well-established line of authority from this court holding that '[b]ecause the district court sits as an appellate court in bankruptcy cases, our review of the district court's decision is plenary.'" 91 F.3d at 568 n.4 (Alito, J., dissenting) (alteration in original) (quoting *In re Visual Indus., Inc.*, 57 F.3d 321, 324 (3d Cir. 1995)). Then-Judge Alito added that de novo review is appropriate because "[w]e are essentially called on to review whether the district court properly decided not to reach the merits of [an] appeal," and "[w]e are in just as good a position to make this determination as [a] district court." *Id.* Further, equitable mootness is intended to be "limited in scope and cautiously applied," and "plenary review would better serve th[o]se ends." *Id.* (internal quotation marks omitted). Then-Judge Alito repeated his criticisms in his *Nordhoff Investments* opinion, *see* 258 F.3d at 192, and we echoed his concerns in *Semcrude*, *see* 728 F.3d at 320 n.6 ("We are inclined to agree with this criticism, but nonetheless are bound to review for abuse of discretion."). Our repeated reversals of district courts' equitable mootness decisions indicate a more stringent standard of review would be a helpful reform.

---

[24] Of course, the fact "[t]hat the courts are creating a doctrine unmoored to the Code is illustrated by their divergence concerning the appropriate test for equitable mootness." Brief of Bankruptcy Law Professors, *supra* note 16, at 11 & n.3 (citing *Phila. Newspapers*, 690 F.3d at 168-69; *In re Paige*, 584 F.3d 1327, 1338-39 (10th Cir. 2009)).

Finally, we could incorporate into our equitable mootness test "a quick look at the merits of [an] appellant's challenge" to determine if it is "legally meritorious or equitably compelling." *Paige*, 584 F.3d at 1339. While no substitute for full consideration on the merits that could provide guidance for future courts and litigants, a brief look at the merits of an appeal and the importance of the issues raised is better than none. *See In re Stephens*, 704 F.3d 1279, 1283 (10th Cir. 2013) (observing that until a novel legal question at issue on appeal was resolved, "debtors and creditors in every individual Chapter 11 case must anticipate the possibility of the expense and delay associated with litigation over this issue"). Merits review is particularly important for complex questions, like whether a plan comports with the Bankruptcy Code's cram down provisions, an issue that "often cries out for appellate review," *Pac. Lumber Co.*, 584 F.3d at 244, or claims involving conflicts of interest or preferential treatment that "go to the very integrity of the bankruptcy process," *Paige*, 584 F.3d at 1348; *see also Pac. Lumber Co.*, 584 F.3d at 251 (quoting *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008)) ("[E]quity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." (alteration in original) (internal quotation marks omitted)). Further, even a preliminary consideration of the merits can guide the court's assessment of the effects of granting different forms of relief. *See Metromedia*, 416 F.3d at 144 ("Often, an appraisal of the merits is essential to the framing of an equitable remedy.").

What we should not do is ignore the serious problems with equitable mootness that are squarely and properly raised by this appeal. Indeed, waiting to resolve the questions surrounding the doctrine will only lead other parties and

district courts, like those in this case, to waste resources litigating equitable mootness. In sum, while I agree with the majority's application of the precedent that binds our panel, that precedent is ripe for reconsideration, and we should revisit or at least reform the equitable mootness doctrine.